Opinion delivered March 7, 1887.

No. 2512.

JIM IRBY *v*. THE STATE.

'1. MURDER—EVIDENCE.—See the statement of the case for statements made to his father by the deceased as soon as he could talk, and within twenty minutes after he received the fatal shot, and which, being clearly res gestæ, were properly admitted in evidence for the State.

2. SAME.—The defense having established the fact that the deceased, after he was shot, made a complaint against the defendant, charging him with

assault with intent to murder the deceased, the trial court did not commit a material error in permitting the State to introduce the said complaint in evidence.

3. SAME—DECLARATIONS.—The physician who attended the deceased being upon the stand, the defense asked him why, during his attendance upon the deceased, he informed the deceased that he (the witness) thought that the deceased would get well. The witness replied that deceased asked him if he would recover, and that he replied that he would, whereupon the deceased said that if he did get well the defendant would "pay for this." Upon the ground that the defense had proved this part of a conversation, the State was permitted, upon cross examination, to prove by the witness other statements of the deceased in that conversation, detailing the circumstances of the shooting. *Held*, that the question of the defense did not call for any part of the conversation between the witness and the deceased, but only for the latter's reason for assuring the former of his recovery, and this did not authorize the proof admitted for the State.

4. SAME—DYING DECLARATIONS.—One of the essential predicates to the competency of dying declarations as evidence is that, at the time they were made, the declarant was conscious of approaching death, and had no hope of recovery. See the opinion in extenso and the statement of the case for a predicate totally insufficient in this respect; wherefore the declarations of the deceased were erroneously admitted in evidence as dying declarations.

5. SAME—EVIDENCE.—The defense proposed, but was not permitted to prove that, a short time prior to the shooting, the deceased was known to be making efforts to trade for a pistol. This proof, in view of the evidence, was competent as tending to explain why it was that defendant and deceased were together at the place of the shooting; why the defendant invited the deceased to that place, and why defendant had a pistol on that occasion; and, moreover, it tended strongly to throw light on the whole transaction.

APPEAL from the District Court of Rusk. Tried below before the Hon. J. G. Hazelwood.

This conviction was in the second degree for the murder of David Needham, in Rusk county, Texas, on the sixteenth day of March, 1886. A term of sixteen years in the penitentiary was the penalty assessed.

W. H. Needham was the first witness for the State. He testified that he was the father of David E. Needham, the deceased. The deceased was shot on the sixteenth day of March, 1886, and died on the twenty-second day of the same month. The deceased, at the time he was shot, was living with the witness at the latter's home place, in Rusk county, and died at his house. The fields of the witness and the defendant were separated by a lane.

While the witness was plowing in his field, on the morning of March 16, 1886, he heard the report of a pistol fired from the direction of the defendant's. That shot was fired between eight and nine o'clock. Soon afterwards he saw a man in his field, running towards him. That man, who was the defendant, stopped before reaching witness, and hallooed to witness: "Come here!" Defendant then turned and went back towards his field. Witness abandoned his plow at once and started towards defendant's field. When he reached the lane he found the deceased stretched on a blanket spread on the ground, having been shot. The ball had entered the face at the base and to the left of the nose. James Irvin, Pete Youngblood and the defendant were with him. Deceased was bleeding but little, but, for five minutes after witness arrived, was unable to speak, though he attempted to do so. Witness asked how deceased got shot, and defendant said that he shot himself. Witness then sent one of defendant's little boys to the branch, about seventy-five yards distant, to get some water. When deceased had drank the water he sat up on the blanket and said to witness: "Pa, I didn't do this. Jim Irby did it. He thought he would kill me and I would never get here. After he shot me I tried to pick up a rail to defend myself, but found myself paralyzed and unable to grasp it." (This is the statement referred to in the first head note of this report.) About fifteen minutes had elapsed since the shooting when the deceased made this statement to witness. Deceased was moved to the house about thirty minutes after the witness reached him. He lived until the twenty-second day of the month, when he died, aged about twenty years. Defendant and deceased had been on unfriendly terms for about three months before the shooting. Witness did not go to the cotton seed pen in the defendant's field, at which point the shooting was said to have occurred.

Cross examined, the witness said that defendant was in the lane where the deceased was lying, when he, witness, reached that point. Defendant had gone when deceased made the statement set out in the witness's direct testimony, but Pete Youngblood and James Irvin were present. Before the defendant left, or about the time witness reached the deceased, witness asked James Irvin to go after a doctor. Defendant volunteered to go, and did go. He called Doctor Longmire, and returned in advance of the doctor, going to witness's house, whither deceased had been taken. Witness did not know what had happened when he left his plow in the field to respond to defendant's

call to "come there." Defendant did not then tell witness that deceased had shot himself, nor did he say that anything had happened; he merely called: "Come here," and went back to the lane where deceased was lying, and where witness found them. Defendant then told witness that deceased had shot himself. School teacher Holloman and the deceased went to defendant's house once that witness knew of. Witness was unable to say that deceased did or did not go to Mrs. Elkins's party. Witness and defendant were not on speaking terms, though witness's wife sometimes visited defendant's family. Witness never did "have any use" for defendant, and never visited him. Witness and defendant traded horses at witness's horse lot three or four days before the shooting. Deceased delivered to defendant the horse traded to him by witness, and spoke to defendant on that day. Witness "just didn't like defendant, but was not on cut throat terms with him."

Joe Goodman was the next witness for the State. He testified that, early in January, 1886, the defendant, while shaving at witness's house, said to witness: "You tell Dave Needham not to put his foot in my house again, for I might say to him more than I ought. I would not hesitate two minutes to take a gun to him." At that time the defendant was enraged over the recent marriage of his daughter to McNeal, and it was then only a day or two after that marriage had been solemnized. Witness afterwards saw the defendant and the deceased together, at the log rolling on the place of W. B. Harper.

The State rested.

J. T. Irvin was the first witness for the defense. He testified that he had occasion to go to defendant's house on the morning of March 16, 1886. Passing through the lane between the fields of defendant and Needham, he observed a mule standing in Needham's field. He went on to defendant's house, and was there told that defendant was in his field. About the time that witness, on his return, got into the lane, he heard the report of a pistol fired in defendant's field. A moment later he saw defendant running very rapidly from an old cotton seed pen in his field, about two hundred yards distant from his lane fence, towards the lane. As he crossed the lane into the Needham field and started across said field, defendant exclaimed in a loud voice that David Needham had shot himself. Witness then saw the deceased coming from the old pen towards the lane. When he reached the fence witness dismounted, spread his saddle blanket

on the ground in the lane, helped deceased over the fence and laid him down on the blanket. Deceased's face was very bloody and he appeared to witness to be seriously wounded. Defendant came back, and W. H. Needham, deceased's father, and Pete Youngblood arrived a few moments later. W. H. Needham asked the witness to go after the doctor. Defendant volunteered to go, and did go, riding the witness's horse. Defendant was then hatless and in his bare feet. Deceased said nothing about the shooting until he was interrogated. After the defendant left to summon the doctor, W. H. Needham knelt down by deceased and asked him several times: "Davy, how did this happen?" As soon as he got back from his trip after the doctor, the defendant went to the house to which the deceased had been taken.

Cross examined, the witness said that deceased endeavored to and finally did answer the questions of his father, but he spoke indistinctly and with difficulty, and witness, whose hearing was poor, did not understand what he said. Old man Needham called upon witness and Youngblood to listen to and remember what the deceased said, but witness could not, and did not understand the deceased. Witness, at best, could hear nothing said by any one in an ordinary tone of voice. Witness on his way to defendant's house before the shooting, observed two parties sauntering around the old cotton seed pen in defendant's field, but he did not recognize them.

T. H. Edmonds testified, for the defense, that he was a justice of the peace of Rusk county. He was sent for by W. H. Needham on the day of the shooting, and went to Needham's house in company with deputy sheriff W. W. Goldsberry. He found deceased shot in the face, and witness thought him to be in a critical condition. He had no conversation with deceased, but from what old man Needham told him he drew up a complaint against defendant for an assault with an intent to murder Dave Needham. Witness then asked deceased if he was able to sign said complaint. He replied that he was and signed it. Witness and Goldsberry then went to defendant's house and found him planting corn. It was now about eleven o'clock. Defendant arranged his bond and went with witness and Goldsberry to an old log cotton pen in his field, where it was said the shooting occurred. That pen was about twelve feet square, and contained some cotton seed. The door was not more than two feet square, and was about three feet above the ground. Witness saw a lit-

tle blood on top of the log which formed the door sill. From that log blood had trickled to the lower logs on the outside, and to some chunks or pieces of rail that were lying around. A man could not enter the cotton seed pen without going in either head or feet foremost. Witness saw a knee print in the cotton seed inside the pen, which indicated that the man who knelt there faced the door. Deceased was quite a tall young man, measuring nearly six feet. Defendant lived between two and three hundred yards distant from Needham's house. He made no effort to escape.

Cross examined, the witness testified that deceased was rational and knew what he was doing when he signed and swore to the complaint referred to by witness on direct examination. Witness saw a rail near the seed pen on which there was some blood. Witness could not say that he was or was not the first person who visited the pen after the shooting. The door of the pen was on the south side. Defendant lived about a quarter of a mile northwest of the pen. Needham lived due north of the pen. At this point the State introduced in evidence the complaint charging defendant with an assault with intent to murder D. E. Needham, referred to by witness.

Tom Clayton testified, for the defense, that he saw the defendant and the deceased together at defendant's house a few days after McNeal married defendant's daughter. They were playing cards. He saw them again together at Mrs. Elkins's party a few days before the shooting.

Frank McNeal, defendant's son-in-law, testified, for the defense, that to his knowledge defendant and deceased were friendly. Deceased visited defendant's house two or three times a week. He and witness invited the defendant and his family to attend the party at Mrs. Elkins's house a few nights before the shooting. School teacher Holloman gave readings at defendant's house, and the deceased attended the said readings. Deceased and defendant played cards with each other. Witness saw deceased at defendant's house a few days after he, witness, married the defendant's daughter.

On his cross examination this witness said that if his marriage to defendant's daughter particularly enraged defendant he did not know it. Defendant sent witness word, on the day after his marriage, to bring his wife to see him, defendant, and his family. Deceased did not steal defendant's daughter for witness,

but witness met her at Needham's house on the night he married her.

Jake Edmonds testified, for the defense, that he saw the deceased at defendant's house a very few days before the shooting, and that defendant and deceased then appeared to be very friendly.

George Irby, the defendant's son, testified that the deceased was on friendly terms with the defendant, and was often at his house. Defendant and deceased were together at Mrs. Elkins's party a few nights before the shooting, when deceased proposed to buy a pistol from the defendant. Defendant agreed to take ten bushels of corn for the pistol. Deceased offered, instead, to give defendant a two year old heifer for the pistol, but said that he wanted to see the pistol before trading. Deceased visited defendant's house as often as two or three times a week, sometimes with Holloman and sometimes alone. He came to defendant's house two or three evenings before the shooting with McNeal, to invite the defendant and his family to the party at Mrs. Elkins's house.

On his cross examination this witness said that he did not know whether any person but himself heard the conversation at Mrs. Elkins's party, between defendant and deceased, about the pistol. Deceased did not aid Frank McNeal in stealing the witness's sister.

Alice Irby testified, for the defense, that she was a daughter of the defendant, and knew that deceased visited her father's house, on friendly terms, both before and after McNeal's marriage to witness's sister. He worked in his field near her father's house, and often came to the house for water. During all that time, and up to the killing, the defendant and deceased were on friendly terms, so far as the witness knew.

Joe Goodman was placed upon the stand by the defense, and testified that he helped to dig the grave and bury the deceased. He had no recollection of telling Anderson, Harper, or McKnight, while digging the grave, that he had never heard defendant threaten to kill deceased. He made no such statement to Harper in the wagon yard on the second night before this trial.

A. J. Anderson testified, for the defense, that he helped Joe Goodman, W. B. Harper and Hiram McKnight dig the grave in which deceased was buried. While the grave was being dug somebody asked Goodman if he had ever heard defendant

threaten to kill deceased. Goodman replied that he had never heard defendant make such a threat, but had heard him say that he did not want deceased to put his foot on his place again. It was then common rumor that Goodman claimed to have heard defendant threaten to take the life of deceased. McKnight and Harper corroborated the testimony of Anderson, and Harper further testified that Goodman repeated the statement to him at a wagon yard on the second night before this trial. Defendant and deceased met at a log rolling on witness Harper's place, about two weeks before the shooting, and were then upon apparently friendly terms, that is, they met and talked as friends usually do.

W. H. Needham testified, for the defense, that "defendant told me, when he came into the field, that my son went down into the field to buy a pistol of him, defendant." Witness denied that, on the Sunday before the shooting, he told A. J. Anderson that deceased traded his (witness's) horse to defendant on the day before, while he (witness) was at the church.

Cross examined, witness said that he traded the horse to the defendant on the Saturday before the shooting, and that deceased delivered the horse to defendant by his authority. Deceased did not say in the lane why he went into defendant's field. Deceased was right handed.

Frank McNeal, recalled by the defense, testified that on the day after the shooting he went with the defendant to the cotton seed pen where the shooting occurred. He found a pistol inside the pen, near the door, the muzzle pointing up. It was a self acting Smith & Wesson pistol, one chamber being empty. There were two knee impressions on the cotton seed, as if some person had knelt on the seed while facing the door. The pistol, when found by witness, was to the left of the knee prints facing the door. A trough, turned bottom up, was resting one end on the door sill and one end on the pile of cotton seed inside. The pistol was lying, butt down, under the said trough. Witness saw the pistol while the defendant was pulling the trough out of the door. The trough was a small one. The pistol could not have fallen from a man's hand into the place and position that witness found it, but could have slipped into that place from a person's hand. Witness's business at the pen was to take measurements, and he found the pistol while the trough was being moved for that purpose. The door was one and a half feet high and two feet wide. Witness saw no blood on the logs, but it had rained

since the shooting, and any blood left at the shooting, if exposed to the rain, would have been washed off.

The defense closed.

W. H. Needham, recalled by the State, testified that he was with deceased constantly from the time he was shot until he died. Deceased told witness daily, except during the last two days before his death, that he was going to die. He said, at each time that he talked to witness about it, that if he did not die from his wound he would starve to death. He died on Tuesday night. He last talked to witness about this matter on the preceding Monday night, when he realized that he was growing worse. He was then conscious and in full possession of his mental faculties, but was dispirited and sad. He expressed no manner of hope of recovery at any of his talks with witness. The last hemorrhage set in shortly after the deceased's last talk with witness, about the shooting, on Monday night. The doctor was not then there, nor did he reach there until after the hemorrhage had occurred. He had left, saying that it was not necessary for him to call again unless he was sent for. In this last conversation deceased only said that defendant shot him intending to kill him. At this point defense objected to the witness testifying to any other statement than that made at this last conversation. The court overruled the objection, and the witness stated that, on the evening of the day on which the shooting occurred, the deceased told witness that defendant came to him in the field and decoyed him to the seed pen in his, defendant's, field, by telling him that he had a pistol at the pen which he wanted to sell him; that he hesitated for a while, fearing defendant's purpose to get a bill against him for having a pistol on his person, but finally went with him; that defendant went into the seed pen, got a pistol out of the cotton seed, and came with it to where he was standing at the door; that, as he approached, the defendant said something about a "dog knot" on the pistol, then placed it within fifteen inches of his, deceased's, face and fired; that defendant then jumped out of the pen and started to shoot him again; that he made a sign to him not to shoot again, as he was killed, when deceased ran off towards witness's field. He said also that he tried to take up a piece of rail, but, being paralyzed in his hand, he could not grasp it. This statement was made to witness by deceased on the day of the shooting and after Doctor Longmire left. Deceased drank some water after he was shot. Witness could not say how much milk and water he swallowed after he

was shot and during his sickness. He swallowed no medicines after the hemorrhage set in on Monday night. The witness did not ask the doctor hôw to prevent starvation after the deceased declared that if he survived the wound he would starve to death. If the deceased ever said anything to the doctor about not being able to eat, the witness did not hear it. Deceased said that he wanted to live long enough to kill the defendant. He was walking around the room at times when talking to witness about the shooting.

Frank McNeal, recalled by the State, testified that he was not asked, when testifying before the inquest, about the trough at the seed pen, and consequently said nothing about it at that time. He did not know where the deceased was at the time of the inquest.

J. T. Irvin testified, for the State, that he had a talk with defendant on the day of the shooting. Defendant told him then that he did not know whether he or deceased had the pistol when it was discharged—that each had it at times, examining it.

The State closed.

Doctor W. D. Holloman testified, for the defense, that he was called to see deceased after the hemorrhage on Monday night preceding his death, which occurred on Tuesday night. He had three hemorrhages after witness reached him, all of which were caused by the sloughing of the blood in the interior jugular vein. If a person wounded as deceased was should move or walk about, such movement would cause the heart to throw the blood to the wounded part in such way as to endanger the patient's condition. Deceased could swallow medicine with some difficulty, and could have taken sufficient nourishment to sustain life. He swallowed some water while witness was with him, and could as easily have taken milk. The wound passed through the back chamber of the mouth, which was a part of the swallowing system. The wound was the primary cause of the hemorrhage, and the hemorrhage was the immediate cause of death.

Doctor R. B. Longmire testified, for the defense, that he reached the deceased about three hours after he was shot. The ball entered the face about half an inch to the left of the nostril, and was taken out about one inch from the right ear. Deceased could take all kinds of fluid nourishment. Witness dismissed him because he appeared to be getting along well. He got up and signed a paper on the day of the shooting. When the witness first reached him, deceased asked him if he would get well.

Witness told him that he would, and he then said that if he got well defendant would "pay for this." Witness then thought that deceased would get well, and it was his opinion that deceased also thought that he would recover. Deceased was convalescent when witness dismissed him three or four days before his death. No complaint was made to witness that deceased could not eat. Deceased could, at any time while witness attended him, have taken sufficient nourishment to sustain life.

On cross examination, the witness stated that it was on the day of the shooting that deceased said that when he got well he would make defendant "pay for it." Witness was asked to state what the deceased said about the shooting at that time. Over defendant's objection, the witness was permitted to answer the question, and, in reply, he repeated a statement of the deceased in substance about the same as that related by W. H. Needham when last on the stand.

The excluded evidence referred to in the last head note of this report was the proposed testimony of Jake Edmonds, to the effect that, on the Sunday preceding the shooting, the deceased made a proposition to buy the witness's saddle; that he told witness that he was on a trade with defendant for a pistol, and, that as soon as he got the pistol he would give it to the witness for the saddle. The bill of exceptions recites that such evidence was offered as tending to show that the purpose of the defendant and deceased in going to the cotton pen was to make a trade for the pistol.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   I.   There was no error in admitting in evidence the statements made by the deceased to his father fifteen or twenty minutes after he had been shot. These statements were made as soon as the deceased could talk, and were clearly, we think, res gestæ. (Willson's Texas Crim. Stats., sec. 1046.)

II.   It was not error that was prejudicial to the defendant to admit in evidence the complaint made by the deceased, charging defendant with an assault made upon him (deceased) with intent to murder him. The fact that such a complaint had been

made had been fully proved by the defendant, and its introduc-
tion in evidence by the State could not, therefore, have injured
the defendant.  If the defendant had not called out the fact
that such complaint had been made, it would unquestionably
have been material error to have admitted it in evidence.

III.  Several hours after deceased was wounded he made cer-
tain statements to the witness Doctor Longmire, his attending
physician, relating to the shooting.  These statements were ad-
mitted in evidence over the objections of the defendant, not as
res gestæ or as dying declarations, but upon the ground that the
defendant, in the examination of his witness Longmire, had
elicited a portion of said statements, and therefore the State had
the right to prove the whole thereof.  Defendant asked the wit-
ness Longmire why he (witness), at the time he was visiting de-
ceased, thought deceased would recover from the wound.  Wit-
ness answered:  "Deceased asked me if he would get well.  I.
told him he would.  Deceased then said, 'When I get well, Jim
Irby will pay for it.'"  On cross examination of the witness the
State called for and was permitted to prove the statements of
deceased, detailing the circumstances of the shooting, as part of
the conversation elicited by the defendant as above stated.  In
this ruling we think the court erred.  The question propounded
by defendant to his witness Longmire did not call for any con-
versation with deceased or for any declarations or statements
made by deceased in relation to the shooting.  It merely called
for the reasons upon which the witness based his opinion that
the deceased was not mortally wounded.  This testimony was,
in our opinion, clearly incompetent and very prejudicial to the
defendant.

IV.  With respect to the statements of the deceased, admitted
as dying declarations, we are of the opinion that none of said
statements were competent evidence.  It was not made clearly
to appear that said statements were made under a sense of im-
pending death.  It is only from necessity that dying declara-
tions are admissible against a person charged with the homicide
of the declarant, and our statute, and the decisions under it,
guard with jealous care the admission of such evidence. Before
statements are admitted as dying declarations, it should be made
clearly to appear that they come strictly within the provisions
of article 748 of the Code of Criminal Procedure.  One of these
provisions and the one which gives sanctity to the declaration,
is "that at the time of making such declaration he was con-

scious of approaching death, and believed there was no hope of recovery."

In the case before us the evidence, in our opinion, falls far short of showing that the deceased was conscious of approaching death, and believed there was no hope of recovery. True, he repeatedly stated that he would not recover—that if the wound did not kill him he would starve to death. Still, he had been advised by his physician that he would get well; he was up and going about; the wound was healing rapidly; his physician had discharged him as convalescent, and it was secondary hemorrhage of the wound that was the immediate cause of his death. Furthermore, accompanying his repeated declarations that he would die, was the declaration that he wanted to live for one thing, and that was to kill the defendant. We have found no decision construing our statute which, in our opinion, would warrant us in holding that the evidence authorizes the admission of any of the statements of the deceased as dying declarations, and it was material error to admit them in evidence. (Willson's Texas Crim. Stats., sec. 1045.)

V. It was error, we think, to refuse to permit the defendant to prove that the deceased, a short time before the shooting, was seeking to trade for a pistol. This evidence was competent as tending to explain why it was that deceased and defendant were together at the place of the shooting; why it was that defendant had a pistol on that occasion; why it was that defendant invited deceased to go with him to the place of the shooting, etc. It tended to throw light upon the transaction, and upon the conduct of both the deceased and the defendant, and, in view of the facts as proved on the trial, was material evidence for the defendant.

We have referred to and determined the material questions presented in the record, and because of the errors we have specified the judgment is reversed and the cause is remanded.

*Reversed and remanded.*