[Criminal No. 487.   Filed November 3, 1920.]

[193 Pac. 19.]

## FELIPE SOLICE, *alias* "CHAMACHO," Appellant, v. STATE, Respondent.

1. INDICTMENT AND INFORMATION—PROSECUTING OFFICER MUST LOOK TO COMMITMENT FOR AUTHORITY TO FILE INFORMATION.—The prosecuting officer must look to the commitment alone for his authority to file information against defendant, accorded preliminary examination and held to answer, as in preparing and filing information he acts in a mere ministerial capacity, not being vested with any discretion as to the crime charged, but being restricted to the crime designated in the commitment.

**2.** INDICTMENT AND INFORMATION—COMMITMENT FOR MURDER AUTHOR-
IZED INDICTMENT FOR MURDER IN THE FIRST DEGREE.—"Murder,"
the crime described in the commitment against defendant, includ-
ing both first and second degree murder, as defined by Penal Code
of 1913, section 172, it was proper for the prosecuting officer to
file information against defendant, charging him with murder in
the first degree.

**3.** CRIMINAL LAW—TESTIMONY OF DECEDENT, AFTER HE WAS SHOT,
ADMISSIBLE AS RES GESTAE.—In a prosecution for murder, state-
ments made by decedent, after he was shot, that defendant had
shot and robbed him, *held* admissible as *res gestae.*

**4.** HOMICIDE—INSTRUCTION ON "EXPRESS MALICE" AND "IMPLIED
MALICE" SUFFICIENTLY FULL.—In a prosecution for murder in the
first degree, instruction that malice aforethought may be either
express or implied, "express malice" meaning a settled purpose and
design to commit the offense, and "implied malice" meaning that
which may be inferred from the act and facts shown, *held* suffi-
ciently full and specific on the question.

APPEAL from a judgment of the Superior Court
of the County of Maricopa. R. C. Stanford, Judge.
Affirmed.

Mr. Weldon J. Bailey and Mr. H. A. Wardenburg,
for Appellant.

Mr. Wiley E. Jones, Attorney General, and Mr.
Louis B. Whitney, Assistant Attorney General, for the
State.

BAKER, J.—The appellant, Felipe Solice (*alias*
Chamacho), was prosecuted and convicted of the
murder of one Margarito Avila, and his punishment
was fixed at life imprisonment. By this appeal we
are asked to review the judgment of conviction and
reverse it.

It is first urged that it was error to force the appel-
lant to trial under the information, which charged
him with murder in the first degree, because "the in-
formation does not follow the commitment." There

---

3. For a collection of authorities on declarations admissible as dying
declarations, see note in 86 Am. St. Rep. 638.

is no merit in this contention. It is very true that the prosecuting officer must look to the commitment alone for his authority to file an information against the defendant, who has been accorded a preliminary examination and held to answer. That officer, in preparing and filing the information, acts in a mere ministerial capacity, not being vested with any discretion or judgment as to the crime to be charged. He is restricted to the crime designated by the magistrate in his commitment. *Fertig* v. *State,* 14 Ariz. 540, 133 Pac. 99.

Now, in this case the record discloses that the order of the committing magistrate, holding the appellant to answer, recites that—

"It appearing to me [committing magistrate] that the crime of felony, to wit, murder, has been committed, on or about the eighth day of July 1919, in the county of Maricopa, state of Arizona, and that there is sufficient cause to believe that Felipe Solice, *alias* Chamacho, is guilty thereof, I order that he, the said Felipe Solice, *alias* Chamacho, be held to answer the same," etc.

This order substantially meets the requirements of section 885, Penal Code, in that it states "generally the nature of the crime." The word "murder" is a technical word, or a "term of art," as the early authorities denominated it. *Dias* v. *State,* 7 Blackf. (Ind.) 20, 39 Am. Dec. 448. The word "murder" has acquired a peculiar meaning in the law and in ordinary speech. It is precisely defined by our statute:

"Murder is the unlawful killing of a human being with malice aforethought." Pen. Code, § 170.

It is divided into two degrees—the first degree including all premeditated, wilful and deliberate murder, and all killing done in the perpetration or attempt to perpetrate certain lesser crimes; the second including all other kinds of murder. Pen. Code, § 172. Murder thus defined includes murder in the first degree

and murder in the second degree. This is well settled. *Stephens* v. *State,* 20 Ariz. 37, 176 Pac. 579; *People* v. *Ting Bow,* 142 Cal. 341, 75 Pac. 899.

As the crime described in the commitment as "murder" included both degrees of murder, it was entirely proper for the prosecuting officer to file the information against the appellant, charging him with murder in the first degree. Such was the crime for the commission of which the appellant stood committed.

It is next objected that the court erred in admitting in evidence certain statements made by the deceased after he was shot. It is the contention of the appellant that these statements were pure hearsay and self-serving, and therefore were inadmissible under any theory of the law. On the other hand, the state claims that the statements were clearly admissible as a part of the *res gestae.*

It appears from the record that on the morning of the 8th of July, 1919, about the hour of 1 o'clock A. M., or very shortly thereafter, the deceased, Margarito Avila, a Mexican, was shot, at a point in a field where he was at the time engaged in the work of irrigating. This point was about a quarter of a mile from some tents occupied by the witnesses Shields and Estrada. The appellant and one Apodoca were present at the time the deceased was shot; the appellant claiming that Apodoca fired the shots. Soon after being shot (the interval of time does not appear with exactness, but it is apparent that it was not great) Avila appeared at the tent of the witness Shields, who was his employer, in a badly wounded condition. He was very bloody, having a wound on the top of his head (probably not a bullet wound), a bullet wound in the shoulder, and another bullet wound in the abdomen, penetrating the bowels, from which he died in a few hours. When Avila reached the tent of Shields, he was staggering, and "tumbled" to the ground, moan-

ing and mumbling as if in great pain and agony. What he then said to the witnesses Shields and Estrada is the matter objected to and claimed to be hearsay. It is as follows:

Witness Shields:

"Q. Now, at that time, as I say, when he came there in that wounded condition, and fell there by the place, what, if anything did you hear him say that you understood—what words? A. I first heard him call 'Padrone,' and then I got 'Chamacho' and 'dinero.'"

Witness Estrada:

"Q. Now, Mr. Bailey asked you what other things he said. I will ask you just what he did say? A. Who said?

"Q. Avila—Margarito Avila? A. He said that they shot him twice, and that they took away $200 from him.

"Q. That who shot him? A. Chamacho."

Were the statements a part of the *res gestae*? We have examined a large number of authorities upon the abstract propositions involved in the rules on which testimony is received or not received as part of the *res gestae*. These authorities satisfy us that the close connection in time between the statements or declaration and the act of which it is said to be a part is an element for consideration; that being close in point of time is not, however, all of the basis for receiving such evidence, and that the ultimate test is spontaneity or instinctiveness and logical relation to the main event; that the tendency of the modern cases is to be liberal in the reception of such testimony.

Mr. Wigmore, under the convenient term of "Spontaneous Exclamations," discussing the exceptions to the general rule excluding hearsay evidence in his work on Evidence, at section 1750, volume 3, page 2256, says:

"It is to be observed that the statements need not be strictly contemporaneous with the exciting cause;

they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway, and to be dissipated. The fallacy, formerly entertained by a few courts, that the utterance must be strictly contemporaneous (*post,* § 1756), owes its origin to a mistaken application of the verbal act doctrine. . . . Furthermore, there can be no definite and fixed limit of time. Each case must depend upon its own circumstances. . . . Since the application of the principle thus depends entirely on the circumstances of each case, it is therefore impossible to regard rulings upon this limitation as having in strictness the force of precedents. To argue from one case to another on this question of 'time to devise or contrive' is to trifle with principle, and to cumber the records with unnecessary and unprofitable quibbles ''

The learned author cites a large number of decisions in support of this doctrine. As said in *Hill's case,* 2 Gratt. (42 Va.) 594 (cited in 3 Wigmore on Evidence, p. 2254):

"*A priori* a stab in the heart would instantaneously suspend the powers of reflection. . . . All the time then, from receiving the stab until he revived from his fit of fainting, he was clearly not in a condition to arrange his ideas and fabricate a story. . . . All that is necessary . . . to make the declaration part of the *res gestae* is that it should be made recently after receiving the injury, and before he had time to make up a story, 'or to devise anything for his own advantage.' ''

And in *Travelers' Ins. Co.* v. *Sheppard,* 85 Ga. 751, 775, 12 S. E. 18 (cited in 3 Wigmore on Evidence, p. 2256), the court was called upon to consider the scope of a section of the Georgia code (Code 1882, § 3773), which provides as follows:

"Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of *res gestae.*"

"What the law altogether distrusts," said Chief Justice BLECKLEY, "is not afterspeech, but after-

thought. . . . The rule contemplates that all the *res gestae,* including declarations forming part thereof, must transpire within the present time of the transaction. But that time, while it cannot be less, may be more, extended than the present time of the principal fact, in some instances a little, in others much, and in others very much more. Usually, if they can all be ascertained, some of the *res gestae* will be found simultaneous with, and some anterior and some posterior to, the principal fact. Thus suppose an electric discharge during a summer shower to be the principal fact, the formation of the cloud, the falling of the rain, the thunder and its reverberation, would all, for some purposes, be within the *res gestae* of the event, though the principal fact was but a flash of lightning.''

As to the character of the declarations he adds:

''That they shall be or appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy. There must be no fair opportunity for the will of the speaker to mould or modify them. His will must have become and remain dormant, so far as any deliberation in concocting matter of speech or selecting words is concerned.''

In *Vickburg R. Co.* v. *O'Brien,* 119 U. S. 99, 30 L. Ed. 299, 7 Sup. Ct. Rep. 118 (see also, Rose's U. S. Notes), (similarly cited by Mr. Wigmore, vol. 3, p. 2255), Mr. Justice FIELD, speaking for the court, said:

''As the declaration was made between ten and thirty minutes after the accident, we may well conclude that it was made in sight of the wrecked train, and in presence of the injured parties, and whilst surrounded by excited passengers. . . . The modern doctrine has relaxed the ancient rule, that declarations, to be admissible as part of the *res gestae,* must be strictly contemporaneous with the main transaction. It now allows evidence of them, when they appear to have been made under the immediate influence of the principal transaction, and are so connected with it as to characterize or explain it. . . . The admissibility of a declaration, in connection with evidence of the principal fact, . . . must be determined by the judge

according to the degree of its relation to that fact, . . . being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.''

In *Commonwealth* v. *Werntz,* 161 Pa. 591, 29 Atl. 272, the declarations of the deceased as to the identity of the person who stabbed him, made shortly after he had been brought out of the shed in which the affray occurred, and while his wound was being dressed in a barber-shop across the street, were pronounced ''the most material evidence'' in the case. The court said:

''The interval of time from the stabbing and the distance of the barber-shop from the shed do not appear with exactness, nor are they material; for it is apparent that they were not great and that the continuity of the events was not broken. The declarations were by the party best informed and most interested, and were made at a time and place, to a person, and under circumstances which effectually exclude the presumption that they were the result of premeditation and design.''

In *Lewis* v. *State,* 29 Tex. App. 201, 25 Am. St. Rep. 720, 15 S. W. 642, the conviction was for murder in the first degree and the death penalty was assessed. Deceased was the mother-in-law of the defendant and was killed with a razor. Over objection of the defendant, the state proved by the physicians that within from a half hour to one hour and a half after deceased had been wounded, she stated to them that—

''Joe Lewis had come up behind her while she was at the washtub, ran his hand under her arm, pulled her backward, and cut her nearly in two.''

The trial judge explained the admission of this evidence as follows:

''The testimony shows the deceased to have been an ignorant negro woman, and that between the infliction of the wound and her statement to the doctors she had not spoken except in a scream or moan, caused presumably from pain; and I believe the circumstances

surrounding this ignorant negro woman utterly preclude the idea of deliberate design, but, on the contrary, was as voluntary and spontaneous as if uttered when she fell under the blow. The evidence was not offered or admitted as dying declarations, but as part of the *res gestae.*"

The court of appeals, passing upon the point, said:

"We agree with the trial judge that the evidence was *res gestae* and admissible. In order to constitute declarations a part of the *res gestae*, it is not necessary that they were precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, tend to explain it, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence. *Foster* v. *State*, 8 Tex. App. 248; *Tooney* v. *State*, Id. 452; *McInturf* v. *State*, 20 Tex. App. 335; *Powers* v. *State*, 23 Tex. App. 42, 5 S. W. 153; *Irby* v. *State*, 25 Tex. App. 203, 7 S. W. 705. We think the declarations made by the deceased and admitted in evidence came within the above-stated rule, considering the circumstances under which they were made, which circumstances exclude the conclusion that they might have been made with deliberate design or were fabricated by the deceased."

In *Stagner* v. *State*, 9 Tex. App. 440, statements made twenty minutes after transaction were admitted. In *Fulcher's case*, 28 Tex. App. 465, 13 S. W. 750, a declaration was admitted which was made fifteen minutes after the shooting. But in *Brown's case* (Tex. Cr. App.), 44 S. W. 174, a declaration made fifteen minutes after the transaction was excluded, and so in *Ford's case* (Tex. Cr. App.), 50 S. W. 350, a declaration made some fifteen minutes after the shooting was excluded. Of course, all these cases depend upon their own peculiar facts. In those cases in which the testimony was held admissible the judges appear to have based their decision on the idea that the circumstances indicated a spontaneity, while in the others there were

circumstances which indicated deliberation and reflection.

Applying the principles announced by Mr. Wigmore and illustrated by the cases cited (we might cite other cases almost without limit to the same effect) to the circumstances under which the statements of the deceased, Avila, were made, convinces us that these statements were admissible in evidence as a part of the *res gestae.* Avila had been desperately wounded, one of the wounds proving to be fatal within a few hours afterwards. He was covered with blood, and was staggering and falling to the ground, moaning and mumbling as if in great pain and agony, as he must have been from the very nature of his wounds. The time elapsing between the shooting and making the statements is marked by the time it would take one to walk from the place where the shooting occurred to the place where the statements were made—the distance of about a quarter of a mile. We think it unreasonable to say that the few trifling moments occupied by him in going from the place where he was shot to the tent where he made the statements should constitute a valid objection to the admission of his statements. There seems to have been no opportunity for the formulation of a deliberate story. It is not at all probable that he was in any mental condition, during the time, to arrange his ideas and concoct a story. He must have been entirely engrossed with his sufferings. It seems to us reasonable to conclude that what he said to the witnesses was instinctive of the difficulty itself, the spontaneous utterances of a mind under the thrall and influence of the mortal assault, and characterizing such assault, and not the mere narrative of a past transaction.

We find no error in the instructions. The court defined every element of the offense charged clearly and correctly. While the court did not charge the jury upon the question of "express malice" and "implied

malice'' in the terms and language requested by the appellant, yet the court in its general charge to the jury said:

" 'Malice aforethought' may be either express or implied. 'Express malice' means a settled purpose and design to commit the offense in question, and must be shown by the proof of that fact directly and without inference; it may be proved as generally understood by expressions of hatred, threats, and the like. 'Implied malice' means that which may be inferred from the act and facts shown. Thus when a wanton, wicked, cruel or revengeful act is shown, the inference or implication may be drawn that the person who did such act was actuated by malice.''

We think this instruction was sufficiently full and specific on the question of malice.

We do not consider it essential or necessary to recapitulate the testimony tending to support the verdict of guilty. Our examination of the facts satisfies us that we ought not to interfere with the verdict on account of any lack of cogency or sufficiency in the proofs against the appellant.

The judgment is affirmed.

CUNNINGHAM, C. J., and ROSS, J., concur.