[Criminal No. 750. Filed December 31, 1931.]

[6 Pac. (2d) 423.]

JESUS MACIAS, Appellant, v. STATE, Respondent.

Mr. Greg Garcia, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. J. R. McDougall, Assistant Attorney General, and Mr. Rouland W. Hill, County Attorney, for the State.

ROSS, J.—The defendant, Jesus Macias, was convicted of murder in the first degree, and sentenced to life imprisonment. He has appealed, and assigns several reasons therefor. He asserts that the information fails to charge murder in the first degree, and that his conviction thereof should be set aside. The allegation in the information is that "Jesus Macias on or about the 5th day of November, A. D. 1930 . . . did then and there wilfully, unlawfully and feloniously and with malice aforethought, kill and murder one Enrique Hernandez, a human being."

The contention is that the information, in order to charge first degree murder, should allege that the act of killing was "wilful, deliberate and premeditated"; that it is not enough to allege that it was "wilful and with malice aforethought." He bases this contention upon the language of section 4584 of the Revised Code of 1928 distinguishing the crime of murder into degrees. By that section, as we said in *Solice* v. *State,* 21 Ariz. 592, 193 Pac. 19, "it is divided into two degrees—the first degree including all premeditated, wilful, and deliberate murder, and all killing done in the perpetration or attempt to perpetrate certain lesser crimes; the second including all other kinds of murder."

In the section of the statute (4583) immediately preceding the section distinguishing it into degrees,

the offense of murder is defined as "the unlawful killing of a human being with malice aforethought."

In *Marquez* v. *Territory*, 13 Ariz. 135, 108 Pac. 258, we laid down the rule that it is not necessary to set forth in an indictment for murder the means and manner of death. The form of the indictment in that case is not set out in the opinion, but we assume from what is said that the omission was of a statement of the instrument with which defendant killed the deceased. Since that case it has been common practice in this jurisdiction to omit from the information or indictment for murder a statement of the means and manner of death. The means used and the manner in which the killing is effected in many cases supplies the intent necessary to make out murder in the first degree, as where the killing is accomplished by lying in wait, or by poisoning, or in the perpetration of arson, burglary, robbery, rape or mayhem. These distinguishing features between murder in the first and second degrees are matters of evidence to be considered by the jury in determining whether the offense charged is of the higher or lesser degree. The means and manner of accomplishing the unlawful killing are important in determining the degree, but are not essential to a good indictment for murder in the first degree.

In *Williams* v. *Territory*, 13 Ariz. 306, 114 Pac. 566, the defendant was indicted for the crime of assault with intent to commit murder. The point was made that the indictment was defective in failing to allege that the assault was deliberate and premeditated. We said:

" 'Murder is the unlawful killing of a human being with malice aforethought.' Section 172, Penal Code 1901. In charging murder, it is sufficient to allege facts showing the unlawful killing of a human being with malice aforethought, without alleging in terms the degree, or facts which bring the murder within

one or the other of the statutory degrees. The jury then determines the degree of the crime from the evidence submitted to it. *Davis* v. *Utah*, 151 U. S. 262, 38 L. Ed. 153, 14 Sup. Ct. Rep. 328. The indictment here charges an assault made with intent unlawfully and with malice aforethought to kill a human being, and is sufficient.''

In *Rodriquez* v. *Territory*, 14 Ariz. 166, 125 Pac. 878, relied upon by defendant to sustain his point, it was said an indictment for murder in the first degree must charge that the killing was wilful, deliberate and premeditated, and with malice aforethought. But an examination of the case will disclose that such statement was unnecessary. In fact, in that case we upheld an indictment that did not allege the killing was deliberate and premeditated.

The objection made to the information is not well founded. It does charge murder in the first degree.

Complaint is made to the effect that the jury ''was not perfectly free from bias and prejudice, and (not) in such condition of mind as to act with an entire impartiality,'' and that the verdict is contrary to the law and the evidence. There is nothing in the record to sustain the statement concerning the jury, and we pass it without further comment. The rest of this assignment invites us to examine and weigh the evidence. This we will do only for the purpose of determining if there was substantial evidence to support the verdict. We will not interfere with or disturb the verdict where the evidence of defendant's guilt is conflicting, or where reasonable persons may draw different conclusions therefrom.

Defendant submitted his cause to the jury on the proposition that it was a case of taking the life of deceased or losing his own. He and deceased were employees, as miners, of the Miami Copper Company, worked in the same mine during what is known as the ''graveyard'' shift, that is, from 11:00 P. M.

to 7:00 A. M. On the morning of November 5, 1930, they ascended from the mine in the same elevator. Those miners who lived in the town of Miami, after coming out of the mine, bathing and changing their clothes, followed the same footpath, as we gather, from the mine into the town. On this morning the defendant and one Salvador Alonzo preceded deceased along the usual pathway to the town but a few minutes. They separated at or in front of defendant's rooming-house. Defendant entered his room, obtained therefrom his pistol, and returned to or near the junction of Gibson Street and Miami Avenue, and when deceased came along on his way to his home spoke two or three words to him and the shooting began. The deceased was armed, and several shots were exchanged. This occurred at about 7:30 in the morning. Which first drew his gun or which fired the first shot is in dispute. Deceased was mortally wounded, and died in the Inspiration Hospital that afternoon at 5:25 o'clock. There existed between them some feeling of hostility, but for how long the evidence does not disclose. They had quarreled and deceased had made threats against defendant, of which defendant had been told. Deceased had been carrying a pistol to his work for some time, and defendant knew it. There was evidence that defendant's reputation for peace and quietude was good, and that of deceased bad.

Defendant argues that this evidence conclusively shows he was acting in self-defense when he shot deceased, and that he should have been acquitted. The evidence strongly tends to show that defendant armed himself and deliberately intercepted deceased, as the latter was going from the mine to his home, and incited the trouble that resulted in the killing. The law is well settled that the plea of self-defense is not available to one who was at fault in provoking

the difficulty that resulted in the homicide. *Carter v. State,* 18 Ariz. 369, 161 Pac. 878; *Murphy v. State,* 33 Ariz. 336, 264 Pac. 685; *Hicklin v. Territory,* 9 Ariz. 184, 80 Pac. 340.

Defendant complains of the admission of a statement by deceased concerning the shooting, made in the Inspiration Hospital to Charles R. Byrne, sheriff of Gila county, along about 9 o'clock that morning, on the grounds that it was not shown that deceased was in the possession of his faculties, or that he believed at the time he was going to die.

Dr. John E. Bacon testified that he saw Hernandez first at 7:50 in the morning; that he was suffering from gunshot wounds in the bowels; that the small bowel had been perforated five times; that the messentery had been perforated once, cutting off the blood supply to the bowels. He stated that Hernandez was "semi-conscious. Dazed, but conscious."

The sheriff testified that a little after 9 o'clock that morning he talked with Hernandez; that "he said he was going to die"; that he took a statement from him in the form of questions and answers, writing down only the answers. Using this memorandum to refresh his memory, he gave decedent's statement as follows: " 'Jesus Macias got sore November 4th, because my brother, Guadelupe Hernandez, pinched him while playing and I, Enrique Hernandez, said, "you can't fight, there is no use." I met him this morning on the corner of Miami Avenue and Keystone Street and he commenced shooting. Salvador Alonzo was with him. He told my brother, Irenio Hernandez, that he was going to shoot me yesterday morning.' Did you shoot? (I must have asked that question.) 'Yes, after I was down.' Can you sign this when I read it to you? 'Yes.' You understand that this statement is voluntary? (I don't know whether he

answered that or not, because I didn't put it down.) It is signed, and signed by the witness."

Defendant contends that the preliminary proof of mental awareness was not sufficient to justify the admission of this statement as a dying declaration. It is, of course, essential that the declarant be sufficiently in possession of his mental faculties to realize what he is saying. At 7:50 o'clock when Doctor Bacon saw Hernandez he was dazed but conscious, and at 9 o'clock he was able to carry on a conversation with the sheriff concerning his difficulty with defendant. Dying declarations generally are made while the declarant is suffering great mental and physical pain. The fact that one is able to hear questions and give intelligent answers thereto is very strong evidence of mental lucidity.

It is also said that the evidence of Hernandez' belief that he was going to die was insufficient. This contention is based in part on the fact that he was operated on. It is said if he had believed that he was *in extremis* he never would have consented to an operation. Just when he was operated on, whether before or after the dying statement, is not definitely shown by the evidence. Nor is it definitely shown that he consented to the operation. The fact is that he said, just at the time of making the statement, that he was going to die. When the statement was made, that was his belief. As was said in *Sparks* v. *State*, 19 Ariz. 455, 171 Pac. 1182:

"The circumstances clearly indicate that the statements made by him were by one about to die, who was in fear of impending death, and who subsequently died; that they were freely and voluntarily made as to a relevant and material fact, and with sufficient consciousness to comprehend the situation and the questions asked and answered. This, we think, places the matter squarely within the rule pertaining to the admissibility of a dying declaration."

Defendant complains of the following instruction:

"You are further instructed, gentlemen of the jury, that the law does not permit one person to kill another merely because the other has made threats against him, unless the deceased at the time of the difficulty, without being wilfully provoked thereto by the defendant and without the defendant having brought on the difficulty, made some overt act or demonstration, indicating to the defendant, as a reasonable man, an intention of killing the defendant or doing him some great bodily harm. Should you find, in this case, beyond a reasonable doubt, that at the time of the fatal difficulty the deceased did not make some overt act or demonstration indicating to the defendant as a reasonable man, an intention to assault him or do him some serious bodily harm or kill him, then any threats previously made against the defendant are immaterial for any purpose in this case and should not be considered by the jury."

The vice in the instruction is, it is said, in the last sentence. That sentence is indeed awkwardly worded and somewhat confusing. At the trial defendant was contending the deceased not only had threatened him, but had made a demonstration as if he would carry out the threat at the time defendant shot him. Keeping these contentions in mind, we interpret the instruction as placing upon the prosecution the burden of proving beyond a reasonable doubt that the deceased did not make a demonstration, and if the prosecution successfully carried this burden the threats made by deceased were immaterial and not to be considered by the jury. The instruction implies that if the prosecution failed to prove beyond a reasonable doubt that the deceased made no demonstration, then the threats were material and to be considered. We do not think, as contended by defendant, that the language of the instruction can possibly be construed as placing on the defendant the burden of showing that the deceased made some overt

act or demonstration immediately before the shooting before he could avail himself of self-defense. We think, on the contrary, the meaning is the very reverse of that.

The following instruction, it is claimed, erroneously states the law:

"You are instructed that there is before you evidence of the good character of the defendant prior to the killing. Previous good character of the defendant is a proper matter for the consideration of the jury, like any other fact proven in the case, but you are instructed that good reputation for peace and quietude prior to the commission of the crime is no defense. The evidence is introduced for the purpose of throwing light upon the question of who was the probable aggressor and if you are convinced by the evidence, beyond a reasonable doubt that the defendant committed the crime as charged in the information, the fact that his reputation was good prior to that time would be no defense."

The criticism is that it "ignores the fact that the law requires the jury to consider the good character of the defendant along with the other evidence in the case and directs them to consider it independent of the rest of the evidence and then only when defendant's guilt is not proved or is doubtful." We think standing alone the instruction is subject to criticism, especially wherein it limits the purpose for which evidence of good character is admitted.

Immediately following the above instruction, the court further stated:

"You are further instructed that proof of good character on the part of the defendant in connection with other evidence, might generate a reasonable doubt which would entitle the defendant to an acquittal though without proof of such good character, the jury would convict."

This is an accurate and correct statement of the law. *Singh* v. *State,* 35 Ariz. 432, 67 A. L. R. 129,

280 Pac. 672. It is, of course, the rule that instructions must be looked at and construed as a whole and not piecemeal. When all the directions given by the court concerning good character are considered together, we think they state fairly well the rule that should govern the jury in the consideration of the question of defendant's guilt or innocence.

Upon the whole record, it appears that the defendant was given a fair and impartial trial, and that the verdict returned was warranted by the evidence. On the whole, the court's instructions were full and complete and as favorable to the defendant as he should expect.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.