[Criminal No. 389.   Filed December 19, 1916.]

[161 Pac. 878.]

## MANNING CARTER, Appellant, v. STATE, Respondent.

1. HOMICIDE—EVIDENCE—ADMISSIBILITY—PREVIOUS QUARRELS.—While, as a general rule, evidence of prior difficulties are inadmissible, yet evidence of difficulties or quarrels so closely connected with the homicide as to be fairly regarded as a contributing feature is admissible.

2. CRIMINAL LAW — HOMICIDE — EVIDENCE — RES GESTAE — PREVIOUS QUARRELS.—In a prosecution for homicide, the evidence showed that defendant, a negro soldier, after escaping arrest by police officers, returned to his quarters, procured his rifle, and thereafter killed one of police officers. *Held* that evidence of the circumstances of the first affray were admissible as part of the *res gestae*.

3. HOMICIDE—EVIDENCE—SUFFICIENCY.—Evidence *held* sufficient to support a verdict of murder in the second degree.

4. HOMICIDE — SELF-DEFENSE — EVIDENCE — SUFFICIENCY.—The plea of self-defense is not available to one who was at fault in provoking the difficulty that resulted in the homicide.

   [As to the defense of self-defense by one who has made an attack or voluntarily entered into a rencounter, see note in 109 Am. St. Rep. 804.]

APPEAL from a judgment of the Superior Court of the County of Santa Cruz.  W. A. O'Connor, Judge.  Affirmed.

Messrs. Duffy & Purdum, for Appellant.

Mr. Wiley E. Jones, Attorney General, for the State.

FRANKLIN, J.—The defendant was charged with the murder of one Robert Heflin.  He was convicted of murder in the second degree.  His motion for a new trial was denied, and he appeals from the judgment and order.

The homicide was committed in Nogales, on a moonlight night, about 11 o'clock, in the month of February, 1915.  The defendant is a negro soldier, and one of a troop of United States cavalry stationed on the border at Nogales.  The defendant admitted the killing, and sought to justify it on the ground of necessity.  The evidence tends to show that the

defendant and some companions were in the habit of having a rendezvous with Mexican women from across the border line; that on the evening in question, the defendant and another negro soldier belonging to the same troop, by the name of Edgar Williams, were out for a frolic, and within less than half an hour of the homicide were following and annoying two Mexican women. The women, when they got near the gas plant in Nogales, becoming frightened by the conduct of the two men, called for help. George Raphael, who was working in the gas plant at the time, heard the call of the women, and coming out found the two men, Williams and defendant Carter, and inquired what was the matter. A heated altercation took place between Carter and Raphael, in the course of which defendant used bad language and made some threats toward Raphael. The latter retreated into the gas plant, and telephoned for a police officer, saying if he did not get help immediately there would either be a dead negro or he would be dead. Policeman Conway quickly responded in an automobile driven by the deceased, Heflin. Conway and Heflin were both armed, Heflin having a twenty-five automatic pistol. Finding the defendant Carter and his companion Williams there, Policeman Conway called to them, and fired his pistol up in the air. Williams stood and was arrested, but defendant Carter began moving away. Conway and Heflin tried to rush Williams along on a run so that they could capture Carter, and Conway, in an effort to do this, hit Williams on the head with his gun. Williams, refusing to move fast enough, was placed in the custody of Heflin, and Conway then began to pursue the defendant Carter, but lost clue of him in a patch of brush a short distance away. Conway, with his gun and a searchlight in hand, searched around for the defendant, and after eluding the officer, Carter, in an ugly and vicious mood, evidenced by his remarks on the way, went directly to the cavalry barracks and got his army rifle and returned with it. The action of Carter in taking his rifle and going to town with it was reported to the captain of the troop, who ordered a detail to make his arrest, bring him back to camp, and put him in the guard-house. While Officer Conway was still searching for defendant Carter, the latter returned in a roundabout way to the place where the deceased, Heflin, had his companion, Will-

iams, in custody, claiming that he did so in order to avoid
any possibility of meeting Raphael and having any further
trouble with him.   Just before arriving on the scene of the
killing defendant Carter stopped, loaded and cocked his rifle,
carrying it at a hip position with the barrel slanting up-
ward.   So far as known there are only two persons living,
the defendant Carter and his companion, Williams, who saw
the killing.   When defendant got close to the deceased, three
shots were fired almost simultaneously—two pistol shots and
one from defendant's rifle.   The ball from Carter's rifle
shattered Heflin's skull, exposing the brains, and Heflin was
instantly dead.   Policeman Conway, hearing the shots, re-
turned from his search, and, coming upon the scene, was
covered with Carter's rifle, ordered to throw his hands up
and keep moving, which order he obeyed.   Defendant Carter
then returned to the military barracks and hid his rifle under
one of the houses, and, proceeding into camp unarmed, the
military detail placed him under arrest and put him in the
guardhouse.   The captain of the troop found Carter with
the odor of mescal liquor strong upon his breath, but cold
sober from the tenseness of events.   After questioning Carter
and finding his rifle, the captain turned him over to the
sheriff of Santa Cruz county.

The testimony of Williams and the defendant as to what
took place when the killing was done present many omissions,
obscurities and inconsistencies, and to believe those parts of
it favorable to the innocence of the defendant would some-
what tax the credulity of a court and jury.   The defendant
knew that the women he had been with earlier in the evening
lived across the Mexican border and had gone home, yet he
claims to have returned to the barracks and armed himself
with a high-power army rifle, loaded and cocked it solely
for the purpose of looking for the women, because he had
been molested on other occasions at the place where he ex-
pected to find them; that he returned to the place of the
homicide in a roundabout way in order to evade the man with
whom he had the trouble at the gas works.   He says:

"I went around a ways to avoid him, and after I got
around a piece I heard someone talking.   I got around a little
further and recognized the voice as Williams'.   I went right
up close and asked what was the matter, and he said, 'I am

arrested'; and I says, 'Arrested?' and he says, 'Yes'; and he says, 'This fellow did not do it, the policeman did it, and he went over there.' I says, 'Over where?' And this dead man said, 'He went right over there,' and took two steps to the front, pointing at the same time, and I looked around, and then he shot at me. I whirled around right quick, and he shot again, and I pulled the trigger at the same time.''

Although he went right up close to the deceased, he was unable to recognize the two men, except by the sound of Williams' voice, and could not tell whether the deceased was a white or black man. He said afterward the reason he could not distinguish the men was because he never got nearer than thirty feet from them. Yet this man, according to his testimony, had the most marvelous powers of sight. Though he could not distinguish a man at a distance of thirty feet, yet he could see the bullet from Heflin's pistol coming right on a line with his eyes.

"Q. At the time you turned your body to look in the direction in which Williams and the officer had told you the other officer had gone, and you heard the shot, then you turned your body back again? A. Yes, sir.

"Q. Did you hear or see any other shot? A. Yes, sir.

"Q. Did you see it or hear it? A. I heard it, and I saw the flash of fire.

"Q. And that shot was coming toward you? A. Yes, sir; right on the line of my eyes.''

Williams testified: "I was standing about four feet of the fellow that had me, this chauffeur, and Private Carter came up with his rifle, and he hollered just about as he got there, and asked who was there, and I told him, and he asked me what I was doing there, and I said, 'I am under arrest'; and he said, 'Who arrested you?' and I said, 'This officer did not, but the other one out there'; and as I said that I pointed in the direction he was in, and this gentleman, this chauffeur, pointed too, and Carter sort of made a turn in the direction he pointed, and this gentleman snatched his revolver out and fired at him. At the first shot he fired Carter staggered and turned to face him, and then both fired again the same time, and I don't know which one of the guns went off first. The first shot went like that [indicating by snapping his fingers], and the next two just like that [indicating], both at the same

time. When he fired this gentleman fell. After he fired I moved on away and got to camp, and I leave Carter there."

The witness testified that when Carter came up, and during all the time afterward, Carter was holding his rifle against his hip with the barrel slanting upward, "and I pointed the way this officer had taken and this man did also, and he [Carter] turned, and when the gentleman shot he [Carter] turned like this [indicating]. He [Carter] did not raise the gun up. He was standing 'ready' all the time." Carter said that he had never seen anybody shoot that way before he did. When Officer Conway found the body of Heflin, it was lying flat on the back with the hands extended. About one-quarter of the left part of the skull was shattered, the brains oozing out upon the ground. The automatic pistol was at his right knee, with the barrel pointing toward his feet and the handle toward his right hand.

It is claimed that the court committed prejudicial error in allowing testimony concerning the altercation between the defendant and George Raphael, and also evidence of the conduct of the accused prior to the killing of deceased. The defendant would restrict the evidence to the facts and circumstances immediately attending the homicidal act. Prior circumstances or difficulties, under the general rule governing the trial of homicidal cases, are inadmissible, one of the reasons being that the accused does not forfeit his right to defend himself against an assault because he has been guilty of a wrongful act in the past. But the rule has important exceptions, and is not to obtain where faults, which, although not occurring at the precise time of the homicide, but previously, may have been so closely connected with it in time and circumstances as to be fairly regarded as operating to bring it on. A learned author says:

"In order for evidence of previous quarrels or of particular acts which constitute no part of the *res gestae* to be admissible against the defendant, it must not be a separate, distinct and independent act, but there must be some link of association, something which draws together the preceding and subsequent acts, something which gives color of cause and effect to the transaction, and sheds light upon the motive of the parties." 1 Michie on Homicide, p. 790.

And again: "Matters so closely connected with the difficulty in time and circumstances as to be fairly regarded as operating to bring it on . . . may be considered to render any act or declaration occurring at the time significant. 1 Michie on Homicide, p. 344.

Cyc., volume 21, at page 929, states the rule thus:

"Evidence of difficulties of defendant with or threats by him against persons other than the deceased is not admissible unless there is a direct connection between the facts sought to be proved and the homicide."

It is apparent that no connected and intelligent statement of the facts and circumstances of this case could be given by the witnesses without disclosing the difficulty accused had with Raphael, his attempted arrest by Officer Conway and the deceased, his flight, and the hasty preparations and return to the scene of the homicide for the perpetration of the wrongful act. Such matters give light upon the motive and intent of the accused; they "give color of cause and effect to the transaction"; they constitute a continuous transaction, forming a link of association culminating in the homicidal act. There is no error here. Defendant urges that the evidence is insufficient to support the conviction, because such facts clearly present a case of self-defense. In stating the facts we do not pretend to give at large every particular circumstance of the matter that might appear favorable to the contention, but rather have we epitomized the more essential parts of it, and presented what, in our judgment, an impartial trial court and dispassionate jury might properly deduce from all the facts and circumstances in a conscientious effort to administer the justice of the land. The jury may have very properly found that when the frolic of the accused with the Mexican women was interrupted and his companion arrested and knocked on the head with a gun, and he pursued and made to run away, all this naturally filled his heart with bitterness and resentment, and in the light of his flight and immediate return to the scene of the difficulty that his purpose and intent was to wreak his malice upon Officer Conway and the deceased, Heflin; that coming back from the military barracks in the roundabout way he states was rather for the purpose of not being surprised by the officer who was looking for him than to avoid meeting Raphael; that if there sub-

sequently arose a necessity to kill Heflin to save his own life, he brought it upon himself by his own fault. The learned counsel for appellant in their able presentation of the law of self-defense have, we are persuaded, overlooked this important feature of the doctrine. The right of self-defense may be tersely stated as the law of necessity. Before one may shield himself on the ground of necessity for taking the life of a fellow-being, he must be without fault in occasioning it. The accused cannot intend to produce the occasion and then shield himself on the ground of necessity. In *Haynes* v. *State,* 17 Ga. 465, the court said: "Before the law of necessity can exist, a cause of necessity must exist."

And in *People* v. *Hunt,* 59 Cal. 430, 435, it is observed: "The plea of necessity is a shield for those only who are without fault in occasioning it, and in acting under it."

"Whenever an assault is brought upon a person by his own procurement, or under an appearance of hostility which he himself creates, with a view of having his adversary act upon it, and he so acts and is killed, the plea of self-defense under such circumstances is unavailing." *People* v. *Glover,* 141 Cal. 233, 74 Pac. 745; *Henry* v. *People,* 198 Ill. 162, 65 N. E. 120; *State* v. *Ballou,* 20 R. I. 607, 40 Atl. 861.

"Where any pretext, design, contrivance, fraud or excuse is resorted to, to bring on a difficulty, or to provoke the occasion for one, the person using it will be regarded as the aggressor therein. And any act of a person by which he puts himself in the way of being assaulted, in order that, when hard pressed, he may have a pretext for taking the life of his assailant, amounts to bringing on a difficulty." Wharton on Homicide, 3d ed., § 323.

The case of *Erwin* v. *State,* 29 Ohio St. 186, 23 Am. Rep. 733, is quoted in Modern American Law, 3, page 578, as a leading case. In that case it is said:

"It is true that all authorities agree that the taking of life in defense of one's person cannot be either justified or excused, except on the ground of necessity, and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself."

If appellant provoked the difficulty with the intention of killing Heflin, then he was guilty of murder in the first or

second degree according to the facts, or, if he provoked the difficulty without such apparent intention, he would be guilty of manslaughter. The question then is simply this, What was appellant's intent? In other words, the matter turns upon appellant's intent, and the results of his intent.

Although in some aspects the evidence of the only persons who witnessed the killing, the defendant and Edgar Williams, is favorable to the defense of self-defense, yet there are other facts and circumstances in the case amply sufficient to support the verdict. The weight and credibility to be given the testimony of a witness is in the province of the jury. In *Quock Ting* v. *United States*, 140 U. S. 417, 420, 35 L. Ed. 501, 11 Sup. Ct. Rep. 733, 734, 851, it is said:

"Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by anyone, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced."

In *Blankman* v. *Vallejo*, 15 Cal. 639, it is said:

"We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears. A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements."

How much weight has the jury given to the testimony of the defendant? How has his credibility been affected in their minds by his appearance when testifying, the manner in which he testified, and the improbability of his story? These are considerations that properly influence and move the ver-

dict of a jury.   As we observed in the case of *Losano* v. *State,* 15 Ariz., at page 118, 136 Pac., at page 865:

"The jury may have made a mistake, but they are more apt to be right in their deductions and conclusions than an appellate court.   They see and hear the witnesses and have the advantage of observing their conduct and demeanor—psychological aids of inestimable worth never found in the cold records submitted to an appellate tribunal."

We have given most careful consideration to the record, which discloses that defendant has had a fair and impartial trial, with every substantial right preserved.   While the appellate court is not in the atmosphere of the trial court, nevertheless a consideration of the obscurities, inconsistencies, omissions and the very inherent improbability of defendant's story convinces us the jury was right.   The evidence would have to be much clearer in favor of the defendant upon the question involved in order to justify this court in setting aside the verdict of the jury against the decision of the trial judge refusing a new trial upon that ground.   Indeed, the accused is fortunate in not having a verdict of murder in the first degree against him, which we are persuaded was not given, because of the ability and persuasive eloquence of counsel in his behalf rather than the merits of his case.

The judgment is in all things affirmed.

ROSS, C. J., and CUNNINGHAM, J., concur.

---

Authorities discussing the question of self-defense set up by accused who began the conflict are gathered in a note in 45 L. R. A. 687.