373 P.2d 363

**STATE of Arizona, Appellee,**

v.

**Howard FIELDS, Appellant.**

No. 1234.

Supreme Court of Arizona,

In Division.

July 10, 1962.

8. Ackel v. Ackel, 57 Ariz. 14, 110 P.2d 238, 133 A.L.R. 549, rehearing denied 57 Ariz. 118, 119, 111 P.2d 628, 133 A.L.R. 556 (1941).

54

Mesch, Marquez & Rothschild, Tucson, for appellant.

Robert W. Pickrell, Atty. Gen., and Lloyd C. Helm, County Atty. of Cochise County, for appellee.

DONOFRIO, Superior Court Judge.

Howard Fields, hereinafter called defendant, was tried and convicted of the crime of assault with a deadly weapon, a felony. From the conviction and sentence he appeals.

The facts are that the defendant operated a transient labor camp in Cochise County, Arizona. On March 16, 1961, Cecil Alexander and six other men came to the camp looking for work. No work was available, but the defendant agreed to feed and house them on credit. Thereafter, Alexander worked during part of three days. On March 25, 1961, the defendant and Alexander reconciled their accounts. It was established that Alexander owed money to the defendant. That evening Alexander

and two others who also owed money to the defendant left the labor camp for Mexico. The two companions, without Alexander's knowledge, had taken the belongings of all three and placed them in the car in which two men had offered to give the three a ride to Mexico if they purchased the gas. After they left the camp defendant went to their room and found that all the belongings and possessions to which he could have looked for payment of the money owed him were gone. Defendant thereupon went to his locker, took his .45 caliber pistol and started looking for the men. He took his son-in-law and two employees from the camp with him in his search. He located them near Kansas Settlement, as they were going south toward Mexico. The defendant motioned for them to stop, and when their car speeded up, defendant pulled in front of them, whereupon they pulled over to the side of the road and stopped. The time was 10:00 or 10:30 p. m. on a dark night, the only light coming from the tail lights of defendant's car. The defendant's evidence was that he got out of the car with his gun in either his pocket or at his side (having taken it off safety) and asked why they had taken their belongings which they promised to leave as security. Alexander protested that they didn't have any of their belongings and one of the other men went around to open the trunk of the car. Defendant testified that Alexander, who was standing near the defendant on the right side of the car

told him to look and see for himself and then made a "break" with his hand which was in his pocket, whereupon defendant shot him. One of the men informed the defendant that he believed Alexander was dead. Defendant then drove to the sheriff's office and turned himself in.

Defendant's assignments of error involve the single issue of whether the trial court erred in refusing to instruct the jury on the issue of self-defense. Defendant contends that where the issue of self-defense is asserted and there is any evidence to support this issue, it must be presented to the jury. The State contends that because there was insufficient evidence on the elements which must be proved to sustain a defense of self-defense the trial court was correct in withholding this issue from the jury.

This court has most recently considered the question of self-defense in a criminal assault setting in Everett v. State, 88 Ariz. 293, 356 P.2d 394 (1960). We there indicated that where there is the slightest evidence that the action was taken in self-defense an instruction on self-defense should be given. We also stated that, in connection with a plea of self-defense in a criminal assault prosecution,

"The question to be ultimately determined by the jury was whether defendant *reasonably* believed he was in personal danger [citing cases] and whether he used no more force than

'necessary' to defend himself (see A.R.S. § 13–246 sub-section B)." 88 Ariz. at 299, 356 P.2d at 398.

In this same case we indicated that while the rules relating to self-defense are not identical in prosecutions for assault and those for homicide, the principles governing homicide cases provide a helpful analogy in interpreting the rules for assault cases.

A.R.S. § 13–246 provides:

"A. Violence used to the person does not amount to assault or battery in the following cases:
* * *

"6. In self-defense, or defense of another against unlawful violence to his person or property.

"B. Only that degree of force may be used which is necessary to accomplish the lawful purpose."

Obviously, this statute does not set out the elements of self-defense. Its purpose is to define the effect of self-defense in assault cases, and we must look elsewhere for the elements of self-defense itself.

In Walker v. State, 52 Ariz. 480, 83 P.2d 994 (1938), a homicide case, the appeal concerned the same question as is involved in this case. There the court said:

"It appears, therefore, in order to sustain a plea of self-defense, (a) the circumstances must be such as to excite the fears of a reasonable person of great bodily injury or death to himself or some other person, (b) the party committing the homicide must have acted under the influence of such fears alone, (c) in resisting an assault the person claiming self-defense must not use any more force than reasonably appears under the circumstances to be necessary to repel the assailant, and (d) if the slayer or the person he is attempting to defend is the assailant or engaged in a mutual combat, the one in whose defense the homicide was committed must really and in good faith have endeavored to decline any further struggle before the killing. Unless each and all of these elements appear in the evidence in an appropriate case, a plea of self-defense is not justified, and it is not error for the court to refuse to instruct upon that issue." 52 Ariz. at 482, 83 P.2d at 995.

■ Assuming that these same elements must be shown to establish self-defense in a criminal assault action, we must review the evidence to see if an instruction was required. In doing so we may look exclusively at defendant's evidence, although it is in conflict with that introduced by the State, since the test is not to weigh the evidence but to determine whether there is any evidence on each of the elements of self-defense, Everett v. State, supra; Odekirk v. Austin, 90 Ariz. 97, 366 P.2d 80 (1961).

The defendant's evidence is this: During the ten days that Alexander had stayed at defendant's camp prior to the night of the shooting, defendant had on one occasion been called to intercede in a dispute between Alexander and another of the men in the camp. At that time he observed Alexander with a knife in his hand and requested that he put it away. On another occasion he observed a quarrel between Alexander and another person at the camp over a card game during which Alexander threatened to cut the throat of his antagonist. Defendant testified that Alexander "went with his hand in his pocket, and I told him I didn't want any of that." Defendant also testified that Alexander had indicated he had some other weapon or weapons in his suitcase, and during quarrels would threaten to "go over there and come back and clean house."

On the night of the shooting defendant went to the room occupied by Alexander and two others and found that all of their possessions had been removed. He immediately got in his car and began to search for Alexander and the others, taking with him his son-in-law and two boys who worked at the camp. Defendant encountered the car carrying Alexander and the others near Kansas Settlement; he twice motioned for them to stop which they did.

"Q. What did you do after the two cars came to a stop?

"A. I got out.

"Q. What did you do?

"A. I got out with my gun and came around the back of the car there.

"Q. To the rear of the car, is that what you are saying?

"A. Yes.

"Q. And did you go to the other car?

"A. Sure did.

"Q. Where in relation to the car were you, did you end up?

"A. At the side of it.

"Q. Which side?

"A. The right-hand side.

"Q. All right. What did you do then?

"A. I asked them if that was a good way for them to do, as nice as I had been to them, take off their stuff I had asked them to leave with me so I could have for security until next week.

"Q. Who were you talking to at that time?

"A. I was talking to all of them.

"Q. Where were they?

"A. They was in the car. They were getting out.

*    *    *    *    *    *

"Q. Did any of them say anything to you?

"A. No more than Cecil.

*　　*　　*　　*　　*　　*

"Q. Now what did Cecil say to you?

"A. Well, he said he didn't have anything.

"Q. Did he use any cuss words?

"A. He sure did.

"Q. What happened then?

"A. Well, he told me to look and see.

"Q. And what did you do?

"A. I didn't look.

*　　*　　*　　*　　*　　*

"Q. And then what happened?

"A. Well, he made a move with his hands. He had his hand in his pocket and he made a break like that. (Demonstrating)

*　　*　　*　　*　　*　　*

"Q. What do you mean by 'He made the break'?

"A. Well, like he was coming out to cut me or something or other. I didn't know what he had.

*　　*　　*　　*　　*　　*

"Q. You were standing right in front of him?

"A. Right in front of him.

"Q. What did he do?

"A. He done this way. (Demonstrating) When he went to come out, that is when I shot."

On cross-examination the following testimony was given:

"Q. All right, you came out with this gun. You took the safety off?

"A. (Nodding.)

"Q. Then what did you do?

"A. I walked over to the car.

"Q. Where was the gun?

"A. Sticking down here in the side of my pocket.

"Q. You put it back in your pocket?

"A. Like that, with my hand on it.

*　　*　　*　　*　　*　　*

"Q. All right, you just had it alongside of you all of this time?

"A. All this time?

"Q. All the time you were having this conversation with Cecil Alexander, Davis and Thurman?

"A. I had the gun.

"Q. Where did you have it?

"A. Right down here beside my pocket, my hand on it just like that.

"Q. Your hand over it?

"A. On it. Never did take my hand off. Just stuck it in like that, holding it there."

\*   \*   \*   \*   \*   \*

And on the same cross-examination:

"Q. I think you testified, Mr. Fields, that you were afraid of Cecil Alexander.

"A. (Nodding.)

"Q. Pardon me?

"A. That is right.

"Q. You weren't very much afraid of him when you had that .45 automatic in your hand, were you?

"A. How come you think I shoot? Just to crip—

"Q. Will you answer the question? Were you afraid of him with that .45 automatic in your hand?

"A. I wouldn't have shot if I wasn't afraid of him."

A deputy sheriff who investigated the scene of the shooting testified that a knife was found in the barrow ditch a little to the north of the blood stains on the highway, and the defendant identified this knife as the one he had previously seen in the possession of Alexander. However, another of the men present testified that it was his knife and that he had thrown it away after the shooting.

The foregoing evidence could have sustained the following inferences by the jury: (a) that the defendant reasonably believed that Alexander was armed with a knife and was inclined to use it in the course of a quarrel, and that the defendant reasonably apprehended the possibility of bodily harm to himself; (b) that the defendant acted solely under the influence of such fear; and (c) that under the circumstances, the force used was reasonably necessary to repel the anticipated attack by Alexander. The evidence supporting these inferences is admittedly meagre, however, we are not prepared to rule as a matter of law that it was so slight as to amount to no evidence at all on any one of the elements set out.

The State makes much of the fact that the defendant sought out Alexander and his companions and argues that he was the aggressor and therefore this case must be governed by the rule of the cases which deny the defense of self-defense to one initiating an altercation unless he has withdrawn from the quarrel prior to the attack defended against, State v. Robinson, 89 Ariz. 224, 360 P.2d 474 (1961); Macias v. State, 39 Ariz. 303, 6 P.2d 423 (1931); Carter v. State, 18 Ariz. 369, 161 P. 878 (1916). See also element (d) in the passage quoted from the Walker case, supra. Viewing the evidence most favorably to the defendant, however, one is not driven to the conclusion that he was an aggressor. The

defendant, as the operator of a "boarding house" or "lodging house" had an innkeeper's lien upon the luggage and personal property of Alexander and his two companions, and under A.R.S. § 33-951[1] was given the right to possession of the baggage and other property until his charges were paid. As one entitled to possession, he had the privilege of attempting to recapture property wrongfully taken from his possession so long as he did not use force amounting to a breach of the peace in so doing. Hodgeden v. Hubbard, 18 Vt. 504, 46 Am. Dec. 167 (1846); McLean v. Colf, 179 Cal. 237, 176 P. 169 (1918); Hamilton v. Barker, 116 Mich. 684, 75 N.W. 133 (1898).

According to the defendant's testimony, he took the gun along for his own protection, and he further testified that he did not display it during the course of the conversation relating to the luggage which had been removed from the camp. By his testimony it was only after the "break" by Alexander that defendant raised the gun and shot. We think the evidence does not conclusively brand the defendant as an "aggressor." This term does not apply to one who asserts a lawful privilege, within the limits of that privilege, but applies rather to one who unlawfully provokes a dispute or quarrel calculated to lead to physical combat.

■ Here, it was for the jury to determine from all the evidence whether the defendant was in fact an aggressor (which would be the case if he exceeded any privilege he might have); whether he reasonably feared bodily harm to himself as he noticed Alexander's "break"; whether he acted solely under the influence of such fear; and whether the force used was reasonably necessary to repel the anticipated attack by Alexander.

■ The court erred in refusing to submit the issue of self-defense to the jury, and the case must be remanded for a new trial.

Reversed and remanded.

BERNSTEIN, C. J., and STRUCK-MEYER, J., concur.

1. "§ 33-951. Lien on baggage and property of guest
    Hotel, inn, boarding house, lodging house, apartment house and auto camp keepers shall have a lien upon the baggage and other property of their guests, boarders or lodgers, brought therein by their guests, boarders or lodgers, for charges due for accommodation, board, lodging or room rent and things furnished at the request of. such guests, boarders or lodgers, with the right to possession of the baggage or other property until the charges are paid."