690 P.2d 775

**STATE of Arizona, Appellee,**

v.

**Vivian Rhea NORIEGA, Appellant.**

**No. 5964.**

Supreme Court of Arizona,
En Banc.

Oct. 29, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Ronald L. Crismon, Asst. Attys. Gen., Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Steve Sherick and Frank P. Leto, Tucson, for appellant.

HAYS, Justice.

Defendant-appellant, Vivian Rhea Noriega, and codefendants, Charles Clemens and Jerry Wilkerson, were charged with burglary in the first degree in violation of A.R.S. § 13–1508, a class-2 felony. The defendant was also charged with aggravated assault in violation of A.R.S. § 13–1204(A)(2), a class-3 felony. For each of Noriega's offenses the state filed punishment enhancement allegations of: the dangerousness of the offenses charged, A.R.S. § 13–604(G); prior felony convictions, A.R.S. § 13–604(B) and (D); and committing a nondangerous felony while on probation, parole, work furlough, or any other release from confinement, A.R.S. § 13–604.01(B). The jury found appellant guilty on both counts and found each crime to be a dangerous offense.

Appellant admitted her two prior convictions: one for procuring or obtaining narcotics by fraud or deceit, a class-4 felony, and another for attempting this offense on another occasion, a class-5 felony. But she denied committing the first degree burglary and aggravated assault while on probation from these two prior felony convictions. Before submission of this disputed question to the jury, the prosecution successfully moved to amend the indictment to charge the defendant under subsection (A) rather than subsection (B) of A.R.S. § 13–604.01. Pursuant to the mandatory sentencing provisions of A.R.S. § 13–604.-01(A), the trial court sentenced Noriega to two concurrent terms of life imprisonment without possibility of parole for 25 years. She appeals from her convictions and sentences. We take jurisdiction pursuant to the Arizona Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4035. We affirm. We find no fundamental error in our search of the record.

The issues we must resolve on appeal are:

1. Whether appellant validly waived her *Miranda* rights.

2. Whether the trial court erred in refusing to instruct the jury on simple

assault or threatening or intimidating as lesser included offenses within aggravated assault.

3. Whether refusal to give an instruction on self-defense constitutes error.

4. Whether the post-conviction amendment of the indictment to charge A.R.S. § 13-604.01(A) was untimely.

5. Whether the post-conviction amendment of the indictment to charge A.R.S. § 13-604.01(A) was barred by a presumption of prosecutorial vindictiveness.

6. Whether the imposition of a life sentence constitutes cruel and unusual punishment or a denial of equal protection.

The essential facts in this case are as follows. On the afternoon of October 1, 1982, the defendant lunched at a Tucson restaurant with Chuck Clemens and Jerry Wilkerson, her accomplices in the burglary. The trio decided to drive to the house of Pat Laughlin, an alleged drug dealer. Although Noriega testified that the purpose of the trip was for Wilkerson and Clemens to buy drugs from Laughlin, the circumstances indicate that the burglary may well have been planned. Clemens parked the vehicle in Laughlin's driveway and raised the hood to simulate car trouble. Clemens remained outside by the vehicle, apparently acting as a lookout. Noriega and Wilkerson broke into the house and began ransacking it. Jim White, a friend of Pat Laughlin's, drove to the house and saw the unfamiliar car in the driveway. He approached Clemens. Clemens explained to White that his car had overheated and that he had pulled it into the driveway to cool it off. Clemens then started the vehicle and drove away.

White went to the door of the house, noticed that it was slightly ajar, and went inside. He noted the disarray in the house, the apparent result of a ransacking, and heard noise coming from the back of the house. He crept to the doorway of the bedroom. There he saw a black man, Wilkerson, with a .45-caliber gun in his hand. Wilkerson appeared to be instructing No-

riega what to look for as she rummaged through the closet. White left the house undetected, ran to a neighbor's house, and directed them to call the police.

White then returned to a vantage point in front of the house. Clemens drove past the house again, loudly honked the horn twice, and then drove away. Minutes later, Noriega emerged from the house, carrying a silver jewelry box, and walked toward the driveway. Wilkerson followed ten yards behind her carrying a blue suitcase. As White confronted the defendant and began to say something to her, Wilkerson ran in the opposite direction. When White attempted to grab Noriega, she pulled out a .25-caliber handgun from her back pocket and screamed, "Stay back or I'll shoot." Noriega then tried to escape by running alongside the road. White followed her in his pickup truck. Each time he drew near, she stopped and pointed the gun at him, causing him to halt his pursuit. She eventually eluded White by running through a neighbor's yard. She was found by Officer Albert Lara hiding in a storage shed in the same neighborhood. She was arrested.

Noriega was advised of her *Miranda* rights and agreed to talk with Officer Lara. After first denying that she had a gun, she showed Officer Lara where she had hidden the gun in the storage shed. The silver jewelry box taken from the Laughlin home was also later found in this shed. Noriega told Officer Lara that she heard glass breaking while looking for a friend's house across the street from the Laughlin residence. As she crossed the street to investigate the reason for the noise, two burglars ran by her from the house. One of the burglars dropped a .25-caliber pistol in the street, which she picked up. When White suddenly appeared on the scene and attempted to grab her, she used the gun to threaten him because she believed he was one of the burglars.

Appellant was interviewed at the Tucson Police Department by Sgt. Robert Mayer. She acknowledged that she had been advised of her constitutional rights and again agreed to make a statement. According to

**480**

Officer Mayer, during this interview Noriega admitted her participation in the burglary and implicated Wilkerson and Clemens. Specifically, she admitted breaking into Laughlin's home while armed with a .25-caliber pistol and ransacking the house thereafter.

Appellant told a different story at trial. She conceded that the story she told Officer Lara after her arrest was a complete fabrication. She denied admitting her participation in the burglary to Sgt. Mayer. She testified that Clemens and Wilkerson proposed to go to Laughlin's house to make an illegal drug buy. She went along for the ride. When they arrived at the Laughlin home, she initially remained in the car with Clemens. After waiting ten minutes for Wilkerson, she knocked on the front door to see what was taking him so long. Wilkerson let her in and told her to wait in the living room because he was busy in the bedroom. She sat down in a living room chair. She maintained that it did not occur to her that a burglary was in progress until she saw the disarray in the rest of the house. She confronted Wilkerson in the bedroom with this accusation. He ordered her to shut up and told her to wait in the living room. She did so. They left the house a few minutes later. As they were leaving the house, Wilkerson handed her a silver jewelry box and asked her to hold it for him. She walked to the driveway, only to find the car gone. In the driveway, near where Clemens parked the car, she found the .25-caliber revolver. When White suddenly appeared and tried to grab her, she threatened him with the gun, allegedly out of fear for her personal safety. According to her testimony, she believed that White was a dangerous associate of the drug dealer-owner of the home and that White intended to harm her.

## I. APPELLANT VALIDLY WAIVED HER *MIRANDA* RIGHTS

Appellant received *Miranda* warnings after her arrest, and she indicated that she understood these rights. She further indicated her willingness to make a statement to the police. Appellant now attacks the voluntariness of this waiver on the ground that she never specifically waived her right for counsel to be present during questioning. This precise contention was considered and rejected by the United States Supreme Court in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). This court has repeatedly rejected this contention as well. *State ex rel. Berger v. Superior Court*, 109 Ariz. 506, 513 P.2d 935 (1973); *State v. Pineda*, 110 Ariz. 342, 345, 519 P.2d 41, 44 (1974). We find no error.

Appellant also contends that the failure of Sgt. Meyer to readvise her of her constitutional rights at her second interrogation, two hours after she initially received *Miranda* warnings, renders this statement involuntary and inadmissible. We do not agree.

Further warnings are not required in the absence of circumstances between the arrest and interrogation which would alert the officers that the accused may not be fully aware of her rights. *State v. Miller*, 110 Ariz. 597, 598, 522 P.2d 23, 24 (1974); *State v. Gilreath*, 107 Ariz. 318, 319, 487 P.2d 385, 386 (1971). There were no such circumstances in this case. Before questioning appellant, Sgt. Mayer first ascertained from the arresting officer that appellant had been advised and understood her rights. This interrogation lasted twenty minutes. She freely answered all the questions put to her, without attempting to limit or terminate the officer's questioning. There is no allegation or evidence of intensive or intimidating interrogation, improper promises or threats, or other evidence of coercion. There was every reason for the officers to believe appellant validly waived her *Miranda* rights. *State v. Allen*, 111 Ariz. 546, 548, 535 P.2d 3, 5 (1975). In *State v. Dixon*, 107 Ariz. 415, 417, 489 P.2d 225, 227 (1971), we found that *Miranda* warnings could be renewed at an interrogation two hours after the original warnings by asking the accused if he had been advised of his constitutional rights. We

find appellant's statement voluntary and admissible.

## II. APPELLANT WAS NOT ENTITLED TO AN INSTRUCTION ON THREATENING OR INTIMIDATING OR SIMPLE ASSAULT

■ Appellant contends that she was entitled to an instruction on simple assault as a lesser included offense within aggravated assault. An instruction on a lesser offense is proper under 17 A.R.S., Rules of Criminal Procedure, rule 23.3, if the crime is a lesser included offense to the one charged and if the evidence otherwise supports the giving of the instruction. *State v. Dugan,* 125 Ariz. 194, 195, 608 P.2d 771, 772 (1980). The trial court refused to instruct the jury on simple assault because there was no evidence to support the giving of this instruction.

■ In determining the sufficiency of the evidence necessary to require the giving of a lesser included offense instruction, the question is whether the jury could rationally fail to find the distinguishing element of the greater offense. *State v. Celaya,* 135 Ariz. 248, 252, 660 P.2d 849, 853 (1983). On the facts here, the distinguishing element between aggravated assault and simple assault is whether in committing the assault appellant "use(d) a deadly weapon or dangerous instrument." A.R.S. § 13–1204(A)(2). Either appellant is guilty of aggravated assault, or she is guilty of nothing on this count. Appellant urges that, at the time of the assault, the automatic pistol was not operable because there was no bullet in the chamber, although there were two live rounds in the clip. Additionally, appellant cites her testimony that, having never fired a gun before, she did not know how to load or fire the pistol. It is clear that the .25-caliber pistol qualifies as a "deadly weapon." This is true whether or not the pistol is loaded. *State v. Morgan,* 128 Ariz. 362, 625 P.2d 951 (App.1981). It follows, therefore, that appellant's alleged ignorance as to how to operate a gun is immaterial so long as she

is capable of credibly threatening another with it.

■ Appellant also argues that she was entitled to an instruction on threatening or intimidating, A.R.S. § 13–1202(A)(1), a class-1 misdemeanor, as a lesser included offense within aggravated assault, A.R.S. § 13–1204(A)(2), a class-3 felony. The trial court denied the requested instruction on the ground that threatening or intimidating was not a lesser included offense within aggravated assault. The test to determine if an offense is a lesser included one, is whether the commission of the greater offense necessarily implies commission of the lesser offense. *State v. Wise,* 137 Ariz. 468, 469, 671 P.2d 909, 910 (1983). Appellant claims that the jury should have been instructed that the defendant "with intent to terrify, threaten(ed) or intimidat(ed) by word or conduct to cause physical injury to another" A.R.S. § 13–1202(A)(1). Identical claims arising under these same statutory provisions have been rejected by three Arizona Court of Appeals decisions. But a split of authority as to the rationale for this conclusion has developed between the Division 1 cases, *State v. May,* 137 Ariz. 183, 188–189, 669 P.2d 616, 622 (App.1983); *State v. Morgan,* 128 Ariz. 362, 366–368, 625 P.2d 951, 955–957 (App.1981), and the lone Division 2 case, *State v. Rineer,* 131 Ariz. 147, 147–149, 639 P.2d 337, 337–339 (App.1981). We are persuaded for the reasons cited by *State v. May, supra,* that threatening or intimidating is not a lesser included offense within aggravated assault.

## III. THE REFUSAL TO INSTRUCT THE JURY ON SELF–DEFENSE WAS NOT ERROR

■ Appellant asserts that she was entitled to an instruction on self-defense. By statute, a person is:

justified in threatening or using physical force against another person when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force.

A.R.S. § 13–404(A). Thus, the instruction must be given if an accused shows that: 1) the defendant reasonably believed that he or she was in immediate physical danger; 2) the defendant acted solely because of this belief; and 3) the defendant used no more force than appeared reasonably necessary under the circumstances. *Gortarez v. Smitty's Super Valu, Inc.,* 140 Ariz. 97, 680 P.2d 807, 815 (1984); *State v. Fields,* 92 Ariz. 53, 56, 373 P.2d 363, 365 (1962). To determine whether a self-defense instruction was required, we look to appellant's evidence even if the evidence is in conflict on this issue, and to any other evidence that might support a claim of self-defense. *State v. Fields, supra.* The slightest evidence of self-defense will mandate an instruction on the issue. *Everett v. State,* 88 Ariz. 293, 297, 356 P.2d 394, 397 (1960).

Assuming, *arguendo,* that appellant was entitled to an instruction on self-defense, we conclude that this was harmless error in view of the jury's verdict that appellant was guilty of the burglary charge.

 Arizona law does not require instruction on self-defense if the accused is at fault in provoking the confrontation. A.R.S. § 13–404(B)(3). Because the jury found appellant guilty of burglary, it would appear that appellant was at fault in provoking the altercation. Appellant seeks to invoke the statutory exception to this rule that one at fault is still entitled to a self-defense instruction if he attempted to withdraw from the situation or clearly communicated an intent to withdraw. A.R.S. § 13–404(B)(3).

 This exception is not applicable to these facts. The record establishes that appellant threatened White with the gun in order to escape from the scene of the burglary, while carrying a jewelry box taken from the burglarized house. This does not constitute withdrawal from the assault. The doctrine of self-defense is not intended to be license for an armed felon to threaten deadly force to escape from the scene of a crime with stolen property. *State v. Wilson,* 113 Ariz. 363, 367, 555 P.2d 321, 325

(1976); *Smith v. State,* 235 Ga. 327, 329, 219 S.E.2d 440, 441 (1975).

 Furthermore, because White personally observed appellant committing the crime of burglary, he had legal authority to arrest her. A.R.S. § 13–3884. Although White did not announce his intention to detain appellant until the police arrived, this is not necessary for a citizen's arrest, where, as here, the accused is pursued immediately after commission of the crime and forcibly resists before such a warning is possible. A.R.S. § 13–3889. In the absence of any allegation or evidence that the victim of the assault used or threatened excessive force in making the citizen's arrest, the felon fleeing the scene of a crime cannot use or threaten deadly force in response to the attempted arrest by an unarmed person, who at most reached out to grab the felon to hold her for the police. · *Cf. People v. Garcia,* 274 Cal.App.2d 100, 78 Cal.Rptr. 775 (1969); *People v. Score,* 48 Cal.App.2d 495, 120 P.2d 62 (1941).

## IV. THE AMENDMENT OF THE INDICTMENT WAS NOT UNTIMELY

Appellant charges that the trial court violated her due process rights by allowing the indictment to be amended after her conviction to impose a mandatory life sentence pursuant to A.R.S. § 13–604.01(A). Appellant premises this claim on two theories: untimeliness and prosecutorial vindictiveness.

 We do not believe that the timing of the amendment of the indictment denied appellant her right to due process of law. First, we note that the factual allegations necessary for the application of A.R.S. § 13–604.01(A) were admitted by appellant or found to be true by the trier of fact. Appellant admitted her two prior convictions. The jury found that appellant committed first degree burglary and aggravated assault while on release from confinement and that both crimes were dangerous in nature. Also, the allegation of

A.R.S. § 13–604.01(B), in conjunction with the allegation of dangerousness in the indictment and in the jury instructions, along with the conduct of the prosecutor, was sufficient to put appellant on notice of the prosecutor's intent to seek the enhanced penalties under subsection (A). Reference in the indictment to the appropriate subsection of the statutory punishment enhancement provision is not indispensable if the accused is on notice of the prosecutor's intent to seek increased punishment. *State v. Barrett*, 132 Ariz. 88, 89, 644 P.2d 242, 243 (1982). Nor is the nonprejudicial misdesignation of a statutory subsection alone sufficient to constitute reversible error. *State v. Parker*, 128 Ariz. 107, 110, 624 P.2d 304 (App.1980), *reversed on other grounds, State v. Parker*, 128 Ariz. 97, 624 P.2d 294 (1981) (miscitation of A.R.S. § 13–604(F) instead of A.R.S. § 13–604(G)). If there is an arguably sufficient, but erroneous, allegation in the indictment, the controlling inquiry is whether there was any surprise or prejudice to the defendant from the omission of the enhanced punishment citation. *See State v. Tresize*, 127 Ariz. 571, 574, 623 P.2d 1, 4 (1980).

There was no prejudice in this case. The prosecutor made two statements on the record before trial that indicated his intent to seek the enhanced penalty. The prosecutor's allegation in the indictment and instruction of the jury on the dangerousness of the offenses charged would not have been necessary if the prosecution intended to proceed under subsection (B) rather than subsection (A). The trial court specifically found that both counsel made statements before and during the course of the trial that indicated that they presumed this was a mandatory life imprisonment case governed by A.R.S. § 13–604.01(A). The court found that both attorneys proceeded to trial on this basis, and neither became aware until after the accused's conviction of the miscitation to subsection (B). There is, therefore, ample evidence that the accused was on notice of the state's intent to seek life imprisonment. Because punishment enhancement allegations are not within the purview of the grand jury's charge, there

is no issue of the prosecutor exceeding the mandate of the grand jury charge. *See State v. Barrett, supra,* 132 Ariz. at 89, 644 P.2d at 243. We note that the habitual offender statute in the case at bar does not constitute a separate crime, but is an aggravating circumstance. *See State v. Turner,* 141 Ariz. 470, 475, 687 P.2d 1225, 1230 (1984).

■ In the absence of any prejudice, we find that the error in the indictment was a technical defect amendable upon the state's motion under 17 A.R.S., Rules of Criminal Procedure, rule 13.5(b). Because there was no prejudice, we further find no violation of appellant's due process rights, though we limit our holding to the facts of this case. *See Oyler v. Boles,* 368 U.S. 448, 453–54, 82 S.Ct. 501, 504–05, 7 L.Ed.2d 446, 450–51 (1962); *Graham v. West Virginia,* 224 U.S. 616, 625, 32 S.Ct. 583, 586, 56 L.Ed. 917 (1912).

## V. THE AMENDMENT OF THE INDICTMENT WAS NOT BARRED BY A PRESUMPTION OF PROSECUTORIAL VINDICTIVENESS

■ Appellant alleges a denial of her due process rights because the post-conviction enhancement of the indictment was precluded by a presumption of prosecutorial vindictiveness arising in this case. The due process clause forbids a prosecutorial decision to enhance an indictment if there is a realistic likelihood of prosecutorial retaliation for the defendant's exercise of his rights. *See Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). The enhanced indictment is forbidden, even in the absence of proof of actual retaliatory motivation on the part of the prosecutor, because of the potentially chilling effect on the exercise of the defendant's rights. *Blackledge v. Perry, supra,* 417 U.S. at 25–28, 94 S.Ct. at 2101–02, 40 L.Ed.2d at 633–34.

A discussion of this issue requires additional facts. As we have previously indi-

cated, on October 8, 1982, appellant was charged with burglary in the first degree and aggravated assault. A jury verdict finding appellant guilty of both offenses was returned on April 8, 1983. The acts allegedly establishing a presumption of prosecutorial vindictiveness arose in a probation revocation proceeding which occurred on October 22, 1982. There, after vigorously contesting and losing a motion in court, the prosecutor approached defense counsel. He informed appellant's attorney that he would seek the maximum sentence of mandatory life imprisonment (pursuant to A.R.S. § 13–604.01(A)) against his client, and that no plea bargain would be offered in the case. At this point, both attorneys exchanged insults, including obscenities. Three days later, on October 25, the prosecutor wrote a letter to defense counsel. In that letter, the prosecutor blamed defense counsel for sparking their altercation. He wrote thereafter:

"When I approached your table after the matter was continued I wanted to let you know that the case was not negotiable due to the seriousness of your client's conduct.

"Your remark 'I don't give a shit' came as quite a surprise since it would seem that your client might since she—not you—faces the life term.

"The name calling by you which followed—including calling me 'a slime' may have made you fell [sic] better but certainly accomplished nothing in terms of dealing with this particular case.

"I am not particularly proud of my response to your outburst but, on the other hand, it seemed the least objectionable to me, from a professional standpoint, considering the other alternatives which crossed my mind.

"I have no intention of fueling the flames of personal notivation [sic] which seem about to engulf your professional well-being therefore, I shall not communicate with you on a personal basis.

"Moreover, since you 'don't give a shit' in this case and seem to have slipped to the point of allowing your personal feelings to cloud your professional judgment, I would suggest that you ask that the case be reassigned to another attorney within your office.

"Perhaps the new attorney would care, at least enough to point out reasons, if any exist, why I'm wrong and should negotiate.

"Certainly, you would agree with me that personal feelings should not enter into the negotiation and disposition of criminal cases.

"Should you wish to apologize you may reach me at . . . .

"All future communications in this case *must* be in writing."

Appellant characterizes the prosecutor's suggestion that he might be willing to negotiate with a different defense attorney as a veiled threat to foreclose plea negotiations as long as defense counsel remained on the case. Appellee contends that the prosecutor refused to negotiate because of the seriousness of the accused's crimes and background, and that defense counsel had simply suggested no persuasive reason why he should negotiate.

On October 27, appellant's counsel wrote a letter to the prosecutor insisting that the prosecutor had been overcome by prosecutorial vindictiveness and demanding that he withdraw from the case. No plea negotiations preceded this dispute, nor were plea negotiations conducted thereafter. In January, 1983, the prosecutor announced on the record that no plea agreement would be offered to appellant. Plea agreements were offered to appellant's codefendants, who were represented by different attorneys, though neither appeared as culpable as appellant.[1] On February 22, 1982, de-

---

**1.** Clemens was offered and accepted a plea bargain of five years in prison. Wilkerson accepted an offer to submit to a bench trial with the sentence not to exceed a certain range, and he was sentenced to 12 years in prison. But Clemens and Wilkerson were only charged with burglary in the first degree, while appellant was also charged with aggravated assault. Only appellant committed a crime while on probation, parole, or other release from confinement, so

fense counsel moved to dismiss or recuse the prosecutor, alleging prosecutorial vindictiveness. The trial court denied the motion without finding whether or not the alleged threat was actually made. The court did so because, after the making of the alleged threat, the decision to seek a life sentence against appellant was reviewed and subsequently affirmed by a panel of three prosecuting attorneys that included the prosecutor in question.

After appellant's conviction, the trial court discovered that the indictment charged appellant with violation of subsection (B) rather than subsection (A) of A.R.S. § 13–604.01. A.R.S. § 13–604.01(B) mandatorily punishes every nondangerous felony committed while on probation, parole, or other release from confinement with the presumptive sentence for the offense committed, without possibility of parole until that sentence is served. A.R.S. § 13–604.01(A) punishes every dangerous felony committed while on probation, parole or any other release from confinement with a mandatory life sentence, without possibility of parole for 25 years. The prosecution moved to amend the indictment to charge appellant under subsection (A) rather than subsection (B) of A.R.S. § 13–604.01.

▆▆ For the reasons that follow, we find no error in granting the motion to amend the indictment subjecting appellant to life imprisonment. At the outset, we note that a threatened refusal to plea bargain because of personal dislike of appellant's counsel would constitute actual prosecutorial misconduct. *See State v. Martin,* 139 Ariz. 466, 481, 679 P.2d 489, 504 (1984). Therefore, a suggestion that a prosecutor would be willing to negotiate with other defense attorneys because he personally dislikes appellant's counsel would also be improper. What the prosecutor appears to have suggested in his letter, however, was that the defense attorney responded in an unexpectedly emotional and retaliatory

manner at his suggestion that the case was likely nonnegotiable. The prosecutor further suggested that defense counsel did not attempt to cite persuasive reasons why he should negotiate, and that another defense attorney would not have been so unprofessional. Given defense counsel's apparent personal animosity for him, the prosecutor recommended that the case be reassigned to another defense attorney, though he did not foreclose other ways of resolving the problem. Because their altercation occurred 20 days after appellant was charged, reassignment of another attorney was still a practical option. The prosecutor also properly remarked that he was not proud of his conduct and that personal feelings should not enter into the disposition of criminal cases. We do not approve of the hostile tone of the prosecutor's letter. Appellant concedes, however, that she cannot establish actual prosecutorial misconduct. She alleges only that a presumption of prosecutorial vindictiveness bars the amendment of the indictment in this case.

We can only speculate as to what the trial court would have ruled and what facts the court would have found when confronted with this issue, because appellant did not raise this particular objection at trial. We nonetheless consider appellant's contention under the doctrine of fundamental error. *See State v. Sorrell,* 132 Ariz. 328, 645 P.2d 1242 (1982); *State v. Edgar,* 126 Ariz. 206, 613 P.2d 1262 (1980).

Assuming without deciding that a presumption of prosecutorial vindictiveness was triggered in this case, we conclude that the presumption has been rebutted, at least on the facts of this case.

The trial court found that the indictment was amended only to cure prosecutorial oversight and to reflect the common understanding of the parties. This justification has been found to rebut a presumption of prosecutorial vindictiveness. *See Pool v. State,* 139 Ariz. 98, 109, 677 P.2d 261, 272 (1984); *Hardwick v. Doolittle,* 558 F.2d

---

only she was subject to enhanced punishment under A.R.S. § 13–604.01(A). The judge who sentenced Clemens stated that his presentence

report indicated a much better background and criminal history than appellant's.

292, 301 (5th Cir.1977); *Cherry v. State,* 414 N.E.2d 301, 305–06 (Ind.1981). Of course, this would not necessarily imply that there was no prosecutorial misconduct in the refusal to plea bargain. But the presumption of prosecutorial vindictiveness would be inapplicable. This doctrine only applies if there is a realistic likelihood of vindictiveness in the decision to reindict a criminal defendant. *See Blackledge v. Perry, supra,* 417 U.S. at 26, 94 S.Ct. at 2101, 40 L.Ed.2d at 633.

Also, the decision to amend was reviewed and reaffirmed by a panel of three county attorneys that included the prosecutor in question. Reassessment by a second prosecutor or agency has been held to rebut the presumption of prosecutorial vindictiveness. *See United States v. Spence,* 719 F.2d 358, 363–64 (11th Cir.1983); *United States v. Ricard,* 563 F.2d 45, 46–48 (2nd Cir.1977). Because we do not believe that a review of the charging decision involving the allegedly vindictive prosecutor could rebut this presumption standing alone, we do not rely on this factor exclusively.

■ Finally, the trial court in resolving the motion to recuse the prosecutor briefly reviewed the merits of the charging decision and found it to be reasonable. The court found that appellant's willingness to threaten someone with a firearm indicated that she was a danger to society. We also note that appellant has a lengthy criminal history. She has been convicted of seven felonies, including robbery, forgery, burglary, receiving stolen property, aggravated assault, and various drug-related misdemeanors. The presentence report indicated that long incarceration for appellant was warranted because her chances for rehabilitation appear slim and she poses a danger to society. Application of a repeat offender statute under these circumstances certainly appears warranted. The trial court did not err in allowing the indictment to be amended.

In closing, we note that the least that can be concluded from the record is that both attorneys engaged in unprofessional conduct. We strongly disapprove of the conduct of both the defense counsel and prosecutor engaging in the degrading public display of hurling obscenities at one another in court even after court had recessed. The accusatory letters sent by both attorneys thereafter did little to defuse the hostility; if anything, they added fuel to the flames of personal animosity. Such conduct reflects discredit on the legal profession and undermines public confidence in our legal system. An attorney has an obligation to avoid such personal disputes and to refrain from perpetuating personal hostility, once such a dispute has arisen.

■ We also emphasize that a prosecuting attorney is held to a higher standard of conduct than an ordinary attorney. As this court stated in *Pool v. Superior Court, supra:*

> [T]he prosecutor is not the representative of an ordinary litigant; he is the representative of a government whose obligation to govern fairly is as important as its obligation to govern at all. The prosecutor's interest in a criminal prosecution "is not that it shall win a case but that justice shall be done." Thus, "while he may strike hard blows, he is not at liberty to strike foul ones." It is the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction just as it is his duty to use all proper methods calculated to bring about a just conviction (citations omitted).

139 Ariz. at 103, 677 P.2d at 266. Although we are not directly confronted with the question in this case, we indicate that a prosecutor's refusal to plea bargain, due to personal dislike of accused's counsel, is conduct prejudicial to the administration of justice which could, under appropriate facts, warrant discipline. *See In re Rook,* 276 Or. 695, 556 P.2d 1351 (1976).

## VI. IMPOSITION OF A LIFE SENTENCE DOES NOT CONSTITUTE A DENIAL OF EQUAL PROTECTION OR CRUEL AND UNUSUAL PUNISHMENT

■ Appellant asserts that A.R.S. § 13–604.01(A) violates equal protection by

it arbitrarily mandating a life sentence for one class of law breakers while not imposing comparable punishment on a similarly situated class of criminals. The class defined by the statute is composed of those who commit dangerous or armed felonies while on probation, parole, work furlough, or other release from confinement. In order to invalidate this legislative classification, we must find that it bears no rational relationship to a legitimate state purpose. *Marshall v. United States*, 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974); *State v. Mulalley*, 127 Ariz. 92, 97, 618 P.2d 586, 591 (1980).

■ The legislature could rationally conclude that a felon who commits an armed offense recently after release from confinement for another felony, and in violation of the conditions of this release from confinement, has simply not been rehabilitated. Appellant's lack of rehabilitation is certainly corroborated by her presentence report in this case. It is also rational to protect the public by deterring felons on release from confinement from committing armed offenses. Finally, this statute arguably promotes the integrity of parole, probation and work furlough systems, by encouraging release from confinement.

■ In *State v. Mulalley, supra,* we concluded that there was a rational basis for the imposition of this same sentence for dangerous assaults by prisoners while in custody. We believe there is also a rational basis for imposition of this punishment on criminals who commit dangerous offenses while on release from confinement. We find no equal protection violation.

■ Appellant also argues that imposition of a life sentence pursuant to A.R.S. § 13–604.01(A) is cruel and unusual, as applied to appellant, in violation of the eighth and fourteenth amendments to the United States Constitution, Arizona Constitution art. 2, § 15, and *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). According to *Solem v. Helm*, a reviewing court must apply a four-part test to determine if a sentence is unconstitutionally excessive. The court must consider: 1) the gravity of the offense; 2) the harshness of the penalty; 3) the sentences imposed on other criminal defendants in the same jurisdiction; and 4) the sentences imposed for the commission of the same crime in other jurisdictions. *Id.* at ——, 103 S.Ct. at 3010–11, 77 L.Ed.2d at 650; *State v. Garcia*, 141 Ariz. 97, 99–100, 685 P.2d 734, 736–37 (1984).

As to the gravity of the offense, we find that appellant's crimes were very serious. It was fortunate that appellant and her accomplice did not observe White during their armed burglary of the Laughlin residence, or he might not be alive today. Appellant's repeated threats against White with a handgun while fleeing the scene of the crime also indicate her willingness to resort to violence that could lead to serious injury or death. The absence of actual injury is scarcely an accurate measure of the danger appellant poses to society. The fact that appellant was on probation from a felony during this time enhances the gravity of the offense. Her willingness to cooperate with others in committing the armed burglary also increases the severity of her crime.

We also do not believe that the sentence imposed upon appellant is too harsh. As this court announced in *State v. McNair*:

Repeat offenders have typically received more severe sentences than first offenders (citations omitted). Likewise, dangerous offenders have received more serious sentences than those who are considered nondangerous (citations omitted). In light of the fact that the offense was committed while on probation, a life sentence is not unduly harsh. As we have previously stated, "the legislature has determined the appropriate punishment for defendant's crime. We need not determine whether the sentence is fair in our view or whether we would impose the same sentence. We must determine only whether it violates the Eighth Amendment as being excessively harsh." (citations omitted)

141 Ariz. 475, 484, 687 P.2d 1230, 1239 (1984).

.Furthermore, appellant's sentence is proportional to those imposed for other and similar crimes in this jurisdiction. Prisoners who commit deadly or dangerous assaults are subject to life imprisonment. A.R.S. § 13–1206.[2] Life sentences under this statute have consistently survived eighth-amendment scrutiny. *See State v. Mulalley, supra; State v. Cruz*, 127 Ariz. 33, 617 P.2d 1149 (1980); *State v. Fears*, 126 Ariz. 597, 617 P.2d 763 (1980); *State v. Barnett*, 127 Ariz. 16, 617 P.2d 1132 (1980).

Appellant's sentence is also proportional to sentences for the same or similar crimes in other jurisdictions. For instance, a *first* conviction for armed burglary of a residence may result in a 20-year to life sentence in Virginia (Va.Code § 18.2–90 (1982)); 5 years to life in Texas (Tex.Ann. Penal Code § 30.02 (1974)); 1 year to life in Florida (Fla.Stat.Ann. § 810.02 (1976)); 10 years to 99 years in Alabama (Ala.Code § 13A–7–5 (1975)); 14 years to life in North Carolina (N.C.Gen.Stat. 14–51 (1981)); 5 to 25 years in Iowa (Iowa Code § 713.2 (1979)); 5 to 25 years in Wyoming (Wyo. Stat. § 6–3–301(c) (1983)); 4 to 25 years in Ohio (Ohio Rev.Code Ann. § 2911.11 (1982)). This does not take into account the punishment for aggravated assault and the aggravating circumstance that both offenses were committed while on probation. Finally, as we noted before, appellant is a repeat offender and would be subject to the recidivist statutes of most states.

In *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Supreme Court upheld the imposition of a life sentence under a recidivist statute against eighth-amendment attack. In *Rummel*, the accused was convicted of three nonviolent theft felonies. Texas' repeat offender statute required imposition of a life sentence for an accused convicted of three felonies. *Id.* at 265, 100 S.Ct. at 1134–1135, 63 L.Ed.2d at 385. Imposition of a life

sentence under a recidivist statute for an accused most recently convicted of burglary or aggravated assault has survived eighth-amendment scrutiny in a number of cases. *See Moreno v. Estelle*, 717 F.2d 171 (5th Cir.1983); *State v. Archibeque*, 95 N.M. 411, 622 P.2d 1031 (1981); *State v. Freeman*, 669 S.W.2d 688 (Tenn.Cr.App. 1983); *State v. Duffel*, 665 S.W.2d 402 (Tenn.Cr.App.1983); *State v. Cole*, 665 S.W.2d 407 (Tenn.Cr.App.1983). *See also Tombrello v. State*, 421 So.2d 1319 (Ala.Cr. App.1982).

██ Finally, in *State v. McNair, supra,* this court held that it was not cruel or unusual to impose a life sentence pursuant to A.R.S. § 13–604.01(A) on a criminal who committed an armed robbery while on probation. We find no distinction of constitutional magnitude between the culpability of an accused who commits armed robbery and one who commits armed burglary and aggravated assault. We find no error.

Affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

FELDMAN, Justice, specially concurring.

I do not agree with the analysis involving A.R.S. § 13–604.01(A), the eighth amendment to the United States Constitution and Article 2, § 15 of the Arizona Constitution. My views on that subject are set forth in my concurring opinion in *State v. McNair*, 141 Ariz. 475, 687 P.2d 1230 (1984). Because I see no reasonable possibility that this offender would have received a sentence which would have made her eligible for parole in less than twenty-five years, I concur in the result as well as in all other parts of the opinion.

---

**2.** On May 1, 1984, A.R.S. § 13–1206 was amended to impose punishment as a class-3 felony, striking the mandatory life imprisonment provision. We compare the statutes in effect at the time of the offense. *Cf. State v. Gonzales*, 141 Ariz. 512, 513, 687 P.2d 1267, 1268 (1984).